Stephen PARKER, for himself, and by his father, Henry L. Parker, and mother, Bernice Parker, his legal guardians

v.

Robert FRY, Gerald Sale, Bill Morgan, Herschel Toombs and Delaine Campbell, in their capacity as members of the Bd. of Educ. of the Piggott, Arkansas School Distr., J. B. Swift in his capacity as Supt. of Schools of the Piggott, Arkansas School District and Herschel Smith in his capacity as Principal of the Piggott High School of Piggott, Arkansas.

No. J–70–C–44.

United States District Court,
E. D. Arkansas,
Jonesboro Division.

Dec. 11, 1970.

Final Order and Permanent Injunction
Jan. 28, 1971.

John P. Sizemore, Little Rock, Ark., for plaintiff.

Guy Brinkley, Piggott, Ark., for defendants.

## MEMORANDUM OPINION

EISELE, District Judge.

Stephen Parker, a seventeen-year-old male student enrolled as a senior in the Piggott High School of Piggott, Arkansas, was suspended from school on or about September 4, 1970, because of the length and style of his hair. On September 23, 1970, he filed this suit seeking to enjoin deprivation under color of state law of plaintiff's rights, privileges and immunities under the Constitution of the United States. Plaintiff alleges violations of his civil rights under 42 U.S.C. §§ 1981 and 1983. Jurisdiction is invoked pursuant to 28 U.S.C. § 1343 (3) and (4) and also 28 U.S.C. §§ 2201 and 2202.

Plaintiff's application for a temporary injunction was tried to the Court in Jonesboro on October 5, 1970, the issue being at that time submitted upon the evidence presented and the arguments and written briefs of counsel. Counsel did not agree to have the entire case heard upon its merits on October 5 and, therefore, only the issues with respect to the application for temporary injunction are before the Court.

The Court has had great difficulty with the legal issues, not only because of the lack of consistency in the many "hair" cases (most of which have been decided in the last eighteen months), but also because of the necessity to determine the scope of 42 U.S.C. § 1983 and the limitations and conditions, if any, that do apply, or, possibly, should apply, to its use.

Once it is conceded, on the one hand, that students do not shed the basic rights conferred upon them as "persons" by the Constitution when they enter the schoolhouse gate, and, on the other hand, that school authorities have the right and power to promulgate rules and regulations reasonably related to, or having an effective relationship with, educational processes and objectives, then one naturally becomes concerned about the restrictions or conditions, if any, on the district court's duty to vindicate such constitutional rights. Although this Court agrees with the general principle set forth in the rather pat statement of the majority in Breen v. Kahl, 419 F.2d 1034 (7th Cir. 1969), to wit:

"Finally, we find unpersuasive the argument that to hold such school regulations unconstitutional would open the floodgates to litigation by students challenging all sorts of school regulations and practices. To fail to hold such arbitrary regulations unconstitutional because of fear of opening the floodgates to litigation, some meritorious and some not, would be an abdication of the judiciary's role of final arbiter of the validity of all laws, and protector of the people, young and old, from the governmental exercise of unconstitutional power."

it is still not a bit sanguine about the possible consequences of "opening the floodgates." It is not a question of abdicating one's responsibility; it is a question of putting things in perspective— of distinguishing between big and little issues and handling each accordingly.

However, recent cases seem to indicate that there is only a very limited and restricted area in which the Court might decline to act in such cases. And yet, when one contemplates trying cases in the federal courts involving the in-school rights of third-graders to dress or wear their hair in a manner contrary to their schools' rules or, indeed, involving the determination of the limits upon, say, the First Amendment rights of a fifth-grader, one is naturally overwhelmed by the possibilities. This is not to suggest that it is not, probably, as mentioned in *Breen, supra,* the most important obligation of the federal courts to be most sensitive to, and diligent in, the enforcement of constitutional and federally confirmed rights, but it is to suggest that some reasonable limitations,

classifications or restrictions might be considered.[1]

■ But it is this Court's reading of the decisions of our Supreme Court and of the courts of appeal which indicates that no such limitations or restrictions have yet been recognized. In fact, it appears quite clear that it is the obligation of this Court to assume jurisdiction of, and to adjudicate, the issues in such cases as the one presently before the Court. See Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); Richards v. Thurston, 424 F.2d 1281 (1st Cir. 1970); and Moreno v. Henckel, 431 F.2d 1299 (5th Cir., 1970).

[1]. By such "reasonable limitations, classifications, or restrictions" the Court is not referring to such rules of construction that already exist, which indicate that constitutional rights for persons within the schoolhouse are not necessarily the same as those for persons on the street. And, of course, the right of free speech, say, within the schoolhouse might be different for a seventh-grader than it would be for a senior in high school. These rules are helpful in fleshing out constitutional rights and privileges in varying circumstances, but they *do not restrict access* to the district court. Some reasonable restrictions upon such access might well be in the interest of a larger justice and might well bring about a greater respect for the law and the courts.

Our society's interest in the protection of most basic constitutional rights has traditionally been the greatest with respect to the adult citizen, sui juris and possessed of the franchise. Now we have become—and rightly so—more concerned with, and for, the constitutional rights of college students and, possibly to a lesser extent, with such rights of high school students. The junior high and grade school cases will follow. The Voting Rights Act Amendments of 1970, which would make all citizens eighteen years of age or older eligible to vote, if upheld, might also be used as the touchstone for a policy evidencing maximum concern for, and maximum protection of, those basic civil and political rights granted by the Constitution and federal statutes. (Even absent such an act, the age of eighteen suggests itself as a reasonable breaking-point for a shift in emphasis and concern.) Such a policy, if adopted, would not remove the federal courts from jurisdiction in such cases involving persons under the age of eighteen —and indeed it could not—but it might permit the development of a different set of procedures by which such rights are vindicated by those under eighteen, such as requirements for the exhaustion of state administrative and judicial remedies or the development of some new abstention doctrine. Such limiting procedures would give meaning to the Supreme Court's statement in Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed. 2d 228 (1968):

"Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint. * * * By and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values."

Judge Blackmun (now Justice Blackmun) recognized the practical necessity of treating persons over eighteen differently: "These plaintiffs are no longer children. While they may have been minors, they are beyond the age of 18." See Esteban v. Central Missouri State College, 415 F.2d 1077, 1089 (8 Cir., 1969). There Justice Blackmun was emphasizing the greater responsibility of persons over 18, but the same can be said in emphasizing the greater concern of the courts for the rights and privileges of those above that age.

If a general approach along these lines were adopted as a basis for procedural change affecting access to the courts, exceptions might have to be carved out for those under 18 who were in penitentiaries, juvenile training schools, hospitals, etc., i. e. were in the physical custody of the state, and for cases involving allegations of racial discrimination. Or perhaps the approach should simply be limited to the primary and secondary "school-rule" cases not involving allegations of racial, or other, invidious discrimination. If the fears of those who argue the "floodgate" theory prove correct, the higher courts, and perhaps the Congress, might well reexamine § 1983, which, though enacted in 1871, appears only to have been discovered in the last decade. Its possible applications, far from being exhausted, have not yet been "scratched."

■ For the plaintiff to prevail upon his application for temporary injunction, he must show that there exists a reasonable probability that he will ultimately be entitled to the relief sought when the case is disposed of upon its merits. See, for instance, Continental Oil Co. v. Frontier Refining Co., 338 F.2d 780, 781 (10th Cir. 1965).

Before reviewing the facts it is necessary to consider the various theories advanced by the plaintiff.

■ The plaintiff argues that the rule here is unconstitutionally vague. The "hair" rule, quoted *infra*, simply prohibits "extreme hair styles." The Court rejects this argument. In the school context detailed, specific rules are not required. See Esteban v. Central Missouri State College, 290 F.Supp. 622, 630 (W.D.Mo.1968). It is true that Judge Doyle held to the contrary in Soglin v. Kauffman, 295 F.Supp. 978, 990 (W.D. Wis.1968), but upon the appeal of *Esteban,* Judge Blackmun (now Justice Blackmun) specifically disavowed Judge Doyle's view:

"Fourthly, we see little basically or constitutionally wrong with flexibility and reasonable breadth, rather than meticulous specificity, in college regulations relating to conduct. Certainly these regulations are not to be compared with the criminal statute. They are codes of general conduct which those qualified and experienced in the field have characterized not as punishment but as part of the educational process itself and as preferably to be expressed in general rather than in specific terms.

\* \* \* \* \* \*

"We regard as quite distinguishable cases such as Hammond v. South Carolina State College, 272 F.Supp. 947 (D.S.C.1967), and Dickey v. Alabama State Bd. of Educ., supra [273 F.Supp. 613, D.C.1967], where the focus was on an attempted restraint of peaceful assembly or speech. Our attention has been called to the fact that Judge Doyle, in his recent opinion in Soglin v. Kauffman, 295 F.Supp. 978, 990–991 (W.D.Wis.1968), expresses disagreement with the observations of Judge Hunter on this aspect of the case. To the extent that, in this area, Judge Doyle is in disagreement with Judge Hunter, we must respectfully disagree with Judge Doyle." 415 F.2d at 1088, 1089.

And there can be no doubt that the plaintiff had adequate notice of what was expected of him. So we have no valid procedural due process issue.

The factual situation (see *infra*) probably gives rise to a stronger First Amendment argument here than in any of the other "hair" cases. Still the Court does not rely heavily on that theory, because the Supreme Court in Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), specifically distinguished "hair style" cases. Furthermore, the defendants here by their hair rule were not attempting to stifle free expression or any symbolic visual expression of dissent or protest even though the enforcement of the rule might have just such an incidental effect (incidental, that is, to the rule's purpose).

The Court does not reject the idea that the right here asserted might be encompassed within the Ninth Amendment as an "additional fundamental right[s] \* \* \* which exist *alongside those* fundamental rights *specifically mentioned* in the first eight \* \* \* amendments" (emphasis added). Griswold v. Connecticut, 381 U.S. 479, 488, 85 S.Ct. 1678, 1684, 14 L.Ed.2d 510 (1965). In identifying these non-specified rights it is important to remember the language of Justice Brandeis in his dissent in Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928).

"The protection guaranteed by the [Fourth and Fifth] [A]mendments is much broader in scope. The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized

the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men."

Indeed, the right to be let alone is greatly cherished by free men.

And, although the Court does not reject the equal protection argument, it should be pointed out that the defendants here have not engaged in invidious discrimination or selective enforcements. The Court is convinced that they would apply their rule "across the board" in good faith, letting the chips fall where they might. Still there is an onerous classification: Those males with extreme hair styles cannot attend school; the others can. Also, it does not appear that the hair regulation has been applied, or has even been thought to apply, to girls in Piggott High.

■ It having been settled in this district and in this circuit that the school authorities have the right and power to promulgate and enforce regulations having an effective relationship to the educational process, Corley v. Daunhauer, 312 F.Supp. 811 (E.D.Ark.1970),[2] it becomes important to determine who has the burden of establishing such an "effective relationship."

■ It would seem clear that those who would deny or restrain liberty should have the burden of justifying such denial or restraint. As stated in Karr et al. v. Schmidt, 320 F.Supp. 728, District Court, W.D.Texas, filed November 19, 1970:

"Following a course first charted in this circuit, most courts have either held or assumed that one's choice of hair style is constitutionally protected and that the State may invade this interest only upon a showing of compelling reason, i. e., that the forbidden style, if allowed, would be a material and substantial interference to the educational system. Consequently, haircut codes have been upheld where the *school has objectively demonstrated that long hair resulted in disruptions of the educational process* such as harassment, use of obscene or derogatory language, fights, health or safety hazards, obscene appearance or distraction of other students. *Conversely, if the school authorities were unable to support factually their rule,* offering speculation only, *the rule is held unreasonable* and hence in violation of the equal protection and/or due process clauses of the Fourteenth Amendment. In short, 'The touchstone for sustaining such regulations is the demonstration that they are necessary to alleviate interference with the educational process.'" (Emphasis added.)

2. It is important to realize, too, the distinction between the facts of the *Corley* case, *supra*, and those before the Court here. In *Corley* the band director prohibited a student from participating in the school band unless his hair was cut to certain standards. The plaintiff there was within the walls of the school. He was not suspended from school for wearing long hair; he was just forbidden to participate in certain band activities. His basic right to an education was not fundamentally threatened. Limitations upon the rights of students, in school, to participate in various programs are much easier to justify than those rules which have the effect of excluding pupils from the entire educational process. As pointed out by Judge Henley: "Finally, a school policy directed at dress or appearance that might be unreasonable or arbitrary in connection with general attendance at the school may be relevant and proper if limited to certain classes or school programs." In *Corley* the Court was specifically invited by counsel to make its ruling broader than the precise circumstances before it. Judge Henley states: "To the extent that the Court has been invited to decide the broader issue, it declines the invitation and will confine itself to what is before it."

A more detailed analysis of this "burden of justification" will be found in Richards v. Thurston, *supra*. There the Court first analyzed the "hair" cases in terms of constitutional theory, rejecting the First Amendment, free-speech arguments and relying upon the "liberty" assurance of the Due Process Clause of the Fourteenth Amendment. Then it observed:

"We do not say that the governance of the length and style of one's hair is necessarily so fundamental as those substantive rights already found implicit in the 'liberty' assurance of the Due Process Clause, requiring a 'compelling' showing by the state before it may be impaired. Yet 'liberty' seems to us an incomplete protection if it encompasses only the right to do momentous acts, leaving the state free to interfere with those personal aspects of our lives which have no direct bearing on the ability of others to enjoy their liberty. As the court stated in Union Pacific Railway Co. v. Botsford, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891):

'No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law. As well said by Judge Cooley, "The right to one's person may be said to be a right of complete immunity: to be let alone." '

\*    \*    \*    \*    \*    \*

"We conclude that within the commodious concept of liberty, embracing freedoms great and small, is the right to wear one's hair as he wishes."

This Court agrees with this analysis and relies principally upon the substantive due process "liberty" requirements of the Fourteenth Amendment in reaching its decision herein.

After making the determination just quoted above, the court in *Richards* turned to the question of justification for interference with this right:

"Determining that a personal liberty is involved answers only the first of two questions. The second is whether there is an outweighing state interest justifying the intrusion. The answer to this question must take into account the nature of the liberty asserted, the context in which it is asserted, and the extent to which the intrusion is confined to the legitimate public interest to be served. For example, the right to appear au naturel at home is relinquished when one sets foot on a public sidewalk. Equally obvious, the very nature of pubic school education requires limitations on one's personal liberty in order for the learning process to proceed. Finally, a school rule which forbids skirts shorter than a certain length while on school grounds would require less justification than one requiring hair to be cut  \*  \*  \*."

And then the court places the burden of justification in the following language:

"Once the personal liberty is shown, the countervailing interest must either be self-evident or be affirmatively shown. We see no inherent reason why decency, decorum, or good conduct requires a boy to wear his hair short. Certainly eccentric hair styling is no longer a reliable signal of perverse behavior. We do not believe that mere unattractiveness in the eyes of some parents, teachers, or students, short of uncleanliness, can justify the proscription. Nor, finally, does such compelled conformity to conventional standards of appearance seem a justifiable part of the educational process.

"In the absence of an inherent, self-evident justification on the face of the rule, we conclude that the burden was on the defendant. Since he offered no justification, the judgment of the district court must be affirmed."

Did the defendants at the hearing on October 5, 1970, sustain the burden of justification of their "hair" regulation?

To answer this question it is necessary to review the evidence presented.

Prior to the publication of the "Student Handbook—Piggott High School, Piggott, Arkansas 1968" (Def. Ex. 1), the Piggott, Arkansas School District had no written code with respect to standards of dress or grooming. Some time around 1967 the school officials, working with representatives of the student government, formulated certain policy statements which, after they were approved by the board of education, were printed in booklet form and distributed to all junior and senior high school students. Apparently there has been no new distribution of the written booklet since its original publication but copies of it have been and are available in the school offices.

The following provision appears under the caption "Personal Appearance" in the handbook:

"In the Jr.-Sr. High School, students are expected to wear appropriate clothing and to present a neat, clean appearance at all times. The school reserves the right to refuse attendance to any student who appears in school in bizarre clothing or *extreme hair styles.*

"During school hours girls may not wear shorts, slacks or jeans or any such type of sports wear. Boys are expected to wear trousers, slacks, or blue jeans with shirt tail worn inside the garment at all times." (Emphasis supplied.)

The board of education of the Piggott Public Schools, District No. 52, has also published a 38-page booklet entitled "Philosophy of Education for Piggott High School" (Def. Ex. 2). At pages 24 and 25, under the caption "Student Dress," one finds the identical language as that quoted from the handbook above.

The plaintiff, Mr. Stephen Parker, attended the Piggott High School during his sophomore year but transferred to the Greenway High School, in an adjoining school district, during his junior year. There is some dispute as to whether he was expelled from Greenway for failing to attend classes or simply dropped out at the semester because he had missed so many classes. Plaintiff testified, however, that with outside work he could graduate with his class at the end of the current school year.

The plaintiff had long hair during his sophomore year but not nearly so long as it is today. At present his hair is shoulder-length. (Note: The parties have agreed that photographs would be made and then submitted and received as part of the evidence in the case, and this has been done.)

Mr. Parker registered for school on August 24, 1970. On August 31 there was an assembly program for the high school students which included an orientation with respect to the rules. The "hair" rule was specifically mentioned. It does not appear, however, that the plaintiff was aware that the rule had been made in written form.

Plaintiff attended classes on September 1 and September 2. On those days no issue was made with respect to the length of his hair. On September 3 during the lunch hour Mr. Parker testified that he was stopped by one of the coaches when he was proceeding to obtain his lunch from an automobile which was "off limits." The plaintiff testified that the coach permitted him to obtain the lunch but then he was called into the principal's office, at which time further inquiry was made concerning the possible infraction, incident to obtaining his lunch from the automobile. Then, the plaintiff testifies, the principal asked him about his hair and advised him that if he did not get it cut he should not come back to school.

Plaintiff then went to Fayetteville to advise with representatives of the American Civil Liberties Union and reported back to school Tuesday morning, September 8, when he was advised that he would have to stay out if he would not have his hair cut. The plaintiff testified that he was given five minutes to obtain his books and leave. Thereafter he tried

to contact members of the school board and did in fact visit with several of them.

On September 15, 1970, the plaintiff's attorney wrote a letter to the defendants Fry, Swift and Smith, which is set out verbatim in paragraph 8 of the complaint. A copy of this letter went to the plaintiff, who then took it to the principal's office, where the principal acknowledged that he had received it.

The plaintiff is a member of a musical group called the "Free Expression Coalition," which performs for profit. The other members of the group also have long hair but none of them is in the Piggott Senior High School.

The Court finds that the plaintiff is wearing his hair long not only as an expression of his individual personality but as a method of protesting the "establishment" and for the purpose of setting himself apart from those whose views he opposes. He testified that he had "never seen a hawk with long hair." He sincerely believes that the country's participation in the Vietnam war is wrong and he wears his hair long as a symbolic protest and as (to him) a matter of principle.

Although the plaintiff testified that there "has to be some rules and regulations," he challenges the "hair" regulation and also takes exception to certain "study period" rules not here in issue.

The plaintiff admits that he may have said that he had a secret desire "to blow up Piggott" but emphasized that this was a figure of speech, indicating that his desire was merely to shake up the citizenry and to get them to thinking in different ways.

The plaintiff has not actually been back in school since September 3.

The principal, Mr. Hershel Smith, testified essentially that he interpreted the hair and dress rule as prohibiting such unusual, bizarre or extraordinary or extreme styles as would result in disruption or distraction in the classrooms. He stated that he has been delegated the responsibility for making judgments with respect to the rules in the high school subject to the supervision of the superintendent and, of course, the school board. A member of the staff or faculty might complain or bring matters to his attention, but he, the principal, made the judgment and decision with respect to individual cases.

Mr. J. B. Swift, who has been superintendent for 21 years, described the procedures that went into the formulation of the student handbook and the role of the student council or government in that effort. He stated that defendants' Exhibit 1 was current except with respect to the provisions for "elective" studies which have nothing to do with this proceeding. He testified that the booklet was handed out back in 1968 to all students from the 7th to the 12th grade and that at that time, plaintiff was a student in the 9th grade.

Mr. Swift testified about "hair" problems that the school had before the adoption of the code. He stated that the high school football team is known as the "Mohawks." On one occasion some of the football players cut their hair in the "Mohawk" style (practically shaven on the sides with a heavy growth in the center and from the front to the rear of the scalp). On that occasion he stated that the authorities sent the boys home and required them to cut the center section to conform with the rest.

On another occasion, Mr. Swift testified, the school authorities had trouble with "Beatle" haircuts, including long "bangs" down to the boys' eyes. Mr. Swift's attitude is that "anything out of the ordinary attracts attention and therefore could be disruptive of the educational process." He testified that the school personnel felt the code was reasonable.

On cross-examination Mr. Swift testified that his idea of an "extreme" hair style would be anything beyond that which is commonly accepted by the general public in the community, including the students as well as the citizenry in general. He stated that there were no blacks in the schools and he could not

express an opinion on an "Afro" hair style.

In discussing the "disruption" which might occur Mr. Swift stated that at the time the football players wore the "Mohawk" haircuts, everyone in the school "laughed" at them. Since he has not been a classroom teacher for some time he has observed no actual disruption in the classrooms occasioned by hair styles. He testified that a student should not be permitted to attend school if he is in continued violation of any of its rules. He further testified that teachers had reported some disruption. He stated that last year, in the junior high school, a teacher, Mr. Porter Rogers, reported trouble in connection with the hair style of a student named Brown. Mr. Rogers apparently complained that the "other kids" paid too much attention to Brown, whose hair style was extreme. Apparently Brown was sent home and got a haircut.

The principal, Mr. Hershel Smith, testified that he had brought the code to the attention of the student body at its first assembly and specifically went over the "hair" regulation. He told of his conversation with the plaintiff on September 3 in which he advised plaintiff that he was in violation of the code and would be given until Tuesday, September 8, to have his hair cut. He related that the plaintiff told him that he did not intend to alter his hair style, that he was a musician, and that he wore his hair in the manner that he did on the basis of principle. Mr. Smith stated that the plaintiff may have mentioned his objection to the war in Vietnam in this connection. Mr. Smith testified that the reaction which they were trying to avoid was the giving of the attention of other students to the one with the extreme hair style, thus taking their attention away from other matters. He also testified that the plaintiff violated other rules such as drinking a Coca Cola while on the gymnasium floor and leaving the school without permission, but he confirmed that, if plaintiff complied with the "hair" code, he would be readmitted to school.

Mr. Smith testified that he had observed the reaction of students in the hallways of the school, and that a certain teacher, Mr. C. O. Evans, had objected to the hair style of plaintiff (and others), asking, in effect, "When are these children going to be made to abide by the rules?" Mr. Smith testified that no girls had been censured for violation of the "hair" rule.

Mr. Charles Evans (referred to above), a classroom history teacher, testified that he had the plaintiff in his class this year. He stated that "discipline and control" were needed and that he had observed on television that when such discipline and control were not maintained the result was that police had to be called in to control the students. He stated that students should be punctual, should show respect, and be orderly. He testified that if you "let down" you will lose control of the class.

Mr. Evans stated that there was "murmuring and whispering" when the plaintiff came through the classroom door. He also testified that other students (specifically not including the plaintiff) who were "borderline" hair cases disturbed their fellow students by "clowning." He testified that the plaintiff had stated in his classroom that "what this country needs is a dose of socialism" and similar remarks, with which, it is clear, Mr. Evans did not agree.

Mr. Evans testified that he was a Christian and believed in God and the Bible and that, according to his religious beliefs, one should wear short hair and be clean shaven. He testified that he believed that Jesus had worn short hair and was clean shaven and, in effect, that this was a rule that God established.

Mr. Evans also testified that the long hair disturbed the *teachers*, and that anything that disturbs the teachers would naturally disturb the classroom teaching situation.

The librarian, Miss Mary Ann Crowson, age 23, stated that she had seen the plaintiff enter the study hall and that

his appearance attracted the attention of the other students.

Mr. Porter Rogers, a teacher since 1945, testified that last year he served as the junior high principal and also taught in the senior high school half time. He felt that students who wore long hair were also most likely to violate the *other* rules—in other words, that bad attitude and long hair usually went together as a "package deal." He felt that lack of conformity created discipline problems.

Mr. Adon Mann, a teacher in the high school, testified about the situation involving a student by the name of David Brown. He then stated that the issue of long hair was a subject of a class discussion and that he wanted to obtain the views of the students. Ninety percent, he said, felt that long hair on boys was distracting. He also felt that the plaintiff had violated another rule by lighting a cigarette on the campus and shouting "Peace" from the school yard while Mr. Mann's class was in session.

Mr. Bob Fry, president of the school board, testified that he had talked with the plaintiff, who asked him if he was going to have to get his hair cut. When Mr. Fry responded that he would, the plaintiff stated, according to Mr. Fry, that he was going back to school and they would have to carry him out and would have "this" (showing a clenched fist) if they did. He stated that the plaintiff remarked that this was a "poor" country, to which he, Mr. Fry, responded that it was the "best country." According to Mr. Fry, the plaintiff then stated, "Yes, except perhaps Canada or Switzerland."

By way of rebuttal, the plaintiff testified concerning his conversation in Mr. Evans' class on current events, mentioned above, that he disagreed with Mr. Evans' statement that President Nixon was doing a good job in dealing with the Vietnam problem. This disagreement was apparently the basis for the further discussion.

The testimony of the defendants indicated clearly that their interpretation of the word "extreme" of necessity had to be referred to what was "currently acceptable" by the community of Piggott. The principal acknowledged that if this were the time of Thomas Jefferson and young people and adults wore their hair in the same style as the plaintiff here, then a person wearing his own (the principal's) short hair style would be "extreme." Conformity, therefore, becomes the basic criterion.

■ From a review of all the evidence, the Court is of the opinion that the defendants have failed to sustain the burden of justifying the Piggott High School rule with respect to "extreme hair styles." The Court is further of the opinion that there is a reasonable probability that the plaintiff will ultimately be entitled to the injunctive relief sought. Certainly this will be so if the defendants are unable to produce more persuasive evidence that such a "hair" rule is necessary to alleviate interference with the educational process. Mere speculation will not suffice.

The sincerity of the defendants is not in doubt. The Court believes that the "hair" rule was adopted because of the conviction of school authorities that to permit extreme hair styles would result in disruption or distraction in the classrooms. See Mr. Hershel Smith's testimony, *supra.* But the facts do not appear to sustain the fear. Generally this fear is based upon the idea as stated by Mr. Swift, the superintendent, that anything out of the ordinary attracts attention and therefore could be disruptive of the educational process. This appears, however, to be more of an educational philosophy than an established scientific fact. Students in our high schools and colleges must have some room within which to express their individual personalities. In Griffin v. Tatum, 300 F. Supp. 60 (M.D.Ala.1969), aff'd in part, rev'd in part, 425 F.2d 201 (5th Cir. 1970), Chief Judge Johnson, after pointing out that the Constitution protects the freedoms to determine one's own hair

style and otherwise to govern one's own personal appearance, goes on to state:

"Indeed, the exercise of these freedoms is highly important in preserving the vitality of our traditional concepts of personality and individuality. In this connection Judge Doyle observed in Breen v. Kahl, supra:

'An effort to use the power of the state to impair this freedom must also bear "a substantial burden of justification", whether the attempted justification be in terms of health, physical danger to others, obscenity, or "distraction" of others from their various pursuits. For the state to impair this freedom, in the absence of a compelling subordinating interest in doing so, would offend a widely shared concept of human dignity, would assault personality and individuality, would undermine identity, and would invade human "being". It would violate a basic value "implicit in the concept of ordered liberty." '

"In short, the freedom here protected is the right to some breathing space for the individual into which the government may not intrude without carrying a substantial burden of justification."

There was also testimony which suggested that students should be made to obey rules simply because they were there, i. e., that the students must learn to respect and obey rules even if those rules are unreasonable. The Court believes that Judge Suttle has clearly answered this argument:

"From specific discipline problems, we proceed to the general proposition advanced by virtually all of defendants' witnesses that a rule such as the one here attacked must be obeyed simply because it is there. Since there are rules in society, it is a valid and reasonable function of the educational process to require and teach that the rule should and must be obeyed. Besides the fact that such an argument would justify any rule, regardless of how unreasonable, arbitrary, or capricious, the Court finds, from the preponderance of the evidence in the case, that, again, requiring adherence to the hair-cut rule is not reasonably related to the professed goal. Instead of teaching respect for society's laws or rules, enforcement of an unreasonable rule undermines respect for other rules and laws which are reasonable and deserve adherence. At best, the rule here attacked teaches only conformity and unreasoning submission to authority; at worst it results in disrespect for all rules and distrust of authority." *Karr, supra.*

One of defendants' witnesses, Mr. Charles Evans, a classroom history teacher, testified that discipline and control were needed and that students should show respect and be orderly. The suggestion is that to permit extreme hair styles will create disciplinary problems and that such styles would tend to disrupt the normal classroom routine, create disturbances, and distract both teachers and students. As stated in Westley v. Rossi, 305 F.Supp. 706, 711 (1969):

"An undifferentiated fear of disturbance is not sufficient to override significant individual freedom afforded by the Federal Constitution. In the instant case there has been no convincing showing by defendants that shoulder length hair will 'materially and substantially interfere with the requirement of appropriate discipline in the operation of the school.' "

Judge Neville, in the *Westley* case, which is from a district court in the 8th circuit, was relying upon Tinker v. Des Moines Independent Community School District, *supra,* in reaching the quoted conclusion. In discussing the fear that non-conformity would lead to disturbance, the Supreme Court in *Tinker* stated:

"Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear * * *. But our Constitution says we must take this

risk * * * ; and our history says that it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society."

Judge Suttle in the *Karr* case, *supra*, after hearing all of the evidence in a similar case, concluded:

" * * * that the style in which a male high school student wears his hair has such a tenuous and speculative relationship to any material or substantial distraction or disruption of the educational or instructional process as to render *any rule regarding length of hair* based upon such a relationship, if any, unreasonable." (Emphasis supplied.)

This Court does not go this far upon the basis of the evidence presently before it. At the hearing on the merits it will receive any other evidence which the parties may wish to offer bearing upon the relationship of the Piggott High School "hair" rule to any legitimate educational objectives.

The Court does not feel that its decision here is in conflict with the recent case of Carter v. Hodges, 317 F.Supp. 89, decided by Judge Paul X. Williams on September 23, 1970. There the student involved physically assaulted the Dean of Men and was expelled because of the assault. The school officials also sought to show that the plaintiff was in violation of the "hair" regulation. Judge Williams relied upon authority that pointed out that each of these cases must be decided in its own particular setting and factual background and within the context of the entire record before the Court. He also recognized "that the right to grow a beard or to wear one's hair at any length is an aspect of personal liberty protected by the due process clause of the United States Constitution, Fourteenth Amendment." Judge Williams was of the opinion, too, as is this Court, that "the burden is on the school

and its officials to show that the rule is reasonable and has an effective relationship to the educational process." The difference is that Judge Williams found from the proof in the *Carter* case that the evidence was overwhelmingly in favor of the defendant school officials. On the basis of the evidence presently before this Court, discussed above, it is impossible to arrive at the same conclusion. After hearing all of the evidence at the trial on the merits, the Court may conclude otherwise, but, at this point, the defendants have failed to sustain the "burden of justification."

The Court has tentatively scheduled the hearing upon the merits herein for Monday, January 25, 1971. A temporary injunction has been entered in conformity herewith.

## FINAL ORDER AND PERMANENT INJUNCTION

By motion filed January 18, 1971, the defendants have asked the Court to decide the merits of this case upon the evidence received at the hearing upon plaintiff's application for a temporary injunction held on October 5, 1970. By letter dated January 20, 1971, the attorney for the plaintiff indicated the latter's willingness to submit the case upon the evidence presented at the October 5, 1970 hearing. Therefore, the defendants' motion of January 18, 1971 is granted.

On December 11, 1970, the Court filed its Memorandum Opinion upon the issues presented by plaintiff's application for a temporary injunction. In that opinion the Court stated:

"From a review of all the evidence, the Court is of the opinion that the defendants have failed to sustain the burden of justifying the Piggott High School rule with respect to 'extreme hair styles.' The Court is further of the opinion that there is a reasonable probability that the plaintiff will ultimately be entitled to the injunctive

**740**

relief sought. Certainly this will be so if the defendants are unable to produce more persuasive evidence that such a 'hair' rule is necessary to alleviate interference with the educational process."

Defendants have decided that they desire to introduce no new, or additional, proof upon the issues before the Court. The Court, therefore, has no alternative but to make its temporary ruling permanent. For this purpose, the Court, after again reviewing the pleadings and the evidence, here adopts the findings of fact and conclusions of law set forth in its memorandum of December 11, 1970.

The application of the plaintiff for a permanent injunction having been submitted to the Court upon the basis of the record and upon the evidence introduced at the hearing upon plaintiff's application for a temporary injunction, said hearing having been held in Jonesboro on the 5th day of October, 1970, and the Court, having considered same, finds and concludes that the plaintiff is entitled to permanent injunctive relief; and, in accordance with its memorandum opinion of December 11, 1970, incorporating its findings of fact and conclusions of law, the Court enters its permanent injunction as follows:

It is ordered that the defendants be, and they are hereby, permanently enjoined from:

(1) suspending, or refusing to enroll, plaintiff, or refusing to permit him to attend school as a student in good standing in the Piggott High School, Piggott, Arkansas, on the basis of the latter's rule with respect to extreme hair styles; and

(2) enforcing, with respect to plaintiff, its rule referring to "extreme hair styles."

It is further ordered that the plaintiff be, and he is hereby, awarded judgment for his costs herein expended.