**Charlene WALLACE, by her parents and next friends, Mr. & Mrs. Charles Wallace, et al., Plaintiffs,**

**v.**

**J. L. FORD, Superintendent of Schools For the Perryville School District No. 7, et al., Defendants.**

**John Olen Haralson, By his Mother and Next Friend, Aquila Haralson, Intervenor-Plaintiff.**

**No. LR–71–C–242.**

United States District Court, E. D. Arkansas, W. D.

Aug. 14, 1972.

Philip E. Kaplan, and Ted Goodloe, Walker, Kaplan & Mays, Little Rock, Ark., for plaintiffs.

G. Ross Smith, Smith, Williams, Friday, Eldredge & Clark, Little Rock, Ark., for defendants.

## MEMORANDUM OPINION AND ORDER

EISELE, District Judge.

This is a civil action brought by the named plaintiffs, on their own behalf and on behalf of the class of all those similarly situated, seeking declaratory relief, a temporary restraining order and a permanent injunction prohibiting and restraining the members of the School Board for the Perryville, Arkansas, School District and the Superintendent from enforcing certain of the provisions of the school's dress code,[1] which plaintiffs claim are unconstitutional.

1. "DRESS

"Girls: Dresses, skirts and blouses, dress slacks and blouses or pant suits may be worn. No divided skirts or dresses; no jeans or shorts may be worn. Blouses that are straight around

A hearing on the motion for a temporary restraining order was held on December 6, 1971. At that time, an agreement was reached between the parties that John Haralson, plaintiff-intervenor, would be permitted to attend school without having to comply with the code pending the hearing on the merits. Haralson had been suspended for violating the "hair" provisions of the dress code. The other named plaintiffs challenged the "dress" provisions of the code. Since they had been voluntarily complying with the code and since the hearing on the merits was set later in the same month, no temporary restraining order was issued with respect to them. All of the plaintiffs were in school at the time of the hearing.

The hearing on the merits was conducted on December 28 and 29, 1971. At the conclusion of the hearing, the Court made certain findings and preliminary rulings. The Court found that the defendants failed to show any lawful justification for the necessity of the "hair" regulation in order to carry out the educational mission of the school. The Court concluded that the regulation was unconstitutionally applied and further that it was unconstitutional on its face. The defendants were temporarily enjoined from enforcing that portion of the "dress" code and the Court indicated that said injunction would be made permanent when it ruled on all of the issues in the case.

With respect to the other portions of the dress code, the Court temporarily enjoined the defendants from enforcing certain portions of the code and approved the continued enforcement of others[2] with the reservation that said rulings would not be binding on the

the bottom may be worn outside the skirt or slacks. The length of the skirts or dresses will be no more than six (6) inches above or six (6) inches below the knee.

"Excessively tight skirts or pants will not be allowed. Girls are expected to be neatly dressed and well groomed at all times.

"Girls will not come to school with hair in rollers.

"Boys: Boys may wear dress or sport pants, including jeans. No frayed trousers or jeans will be allowed. Shirt tails, unless the tail is straight and hemmed, will be worn inside the pants.

"Socks are required at all times.

"Boys will be expected to be neat and well groomed at all times. This means that their hair will be trimmed; it will not be down over the ears, in the eyes or down over the shirt collar. The face will be clean shaven—no mustaches, beards or sideburns below the ear lobes.

"General: No tie-dyed clothing will be worn. Shirts or clothing having slogans, pictures, or emblems, etc. will not be worn except school approved emblems."

The following notice, amending the code, was circulated at the beginning of the school year:

"To the girls at Perryville Jr. and Sr. High and their parents:

"After checking in some stores and talking with parents concerning the girls' dress, we have decided to relax the code. We will allow jeans that are made for girls to be worn providing: If the jeans open in front, a tunic or square-tailed blouse must be worn to conceal the opening. If the jeans open on the side, then an ordinary length blouse may be worn. In either case the jeans will not be allowed if they fit too tightly.

"Our dress code was made to promote neatness and not to make any difficulties for parents."

2. The defendants were enjoined from enforcing the following provisions of the code:

"Girls: Dresses, skirts and blouses, dress slacks and blouses or pant suits may be worn. No divided skirts or dresses; no jeans or shorts may be worn. Blouses that are straight around the bottom may be worn outside the skirt or slacks.

\*　　\*　　\*　　\*　　\*

"Boys: Boys may wear dress or sport pants, including jeans. No frayed trousers or jeans will be allowed. Shirt tails, unless the tail is straight and hemmed, will be worn inside the pants.

\*　　\*　　\*　　\*　　\*

". . . hair will be trimmed; it will not be down over the ears, in the eyes or down over the shirt collar. The face will be clean shaven—no mustaches, beards or sideburns below the ear lobes.

". . . No tie-dyed clothing will be worn. Shirts or clothing having slo-

Court in making its final decision. The Court further stated that it was only dealing with the specific language contained in the code and that the Court did not intend to prohibit the defendants from drafting and enforcing a new code pending the final ruling of the Court.

This opinion constitutes the Court's findings of fact and conclusions of law. It adopts the previous oral findings and conclusions made at the end of the hearing where not inconsistent with this written memorandum.

The Perryville school district covers an area of approximately 396 square miles of predominantly rural farm land. It encompasses the town of Perryville and four or five smaller communities. The student population of the district for the 1971–72 school year totalled approximately 830 students. Approximately one-half of those are considered secondary students and are subject to the regulations under consideration here.

█ Turning first to the "hair" portion of the dress code, plaintiff-intervenor, John Haralson, a senior at Perryville High School, was suspended from school on November 29, 1971, because the length of his hair and sideburns was in violation of the dress code. He was given the opportunity to trim his hair in compliance with the code and thereby be readmitted to school, but he refused. There is no contention by the school that his hair posed a sanitation or safety problem. And there is no proof to support the argument that the length of his hair was a disruptive influence.

Byron Donald Doughty, not a party to this suit but a student in the eleventh grade at Perryville, was called for the purpose of exhibiting the enforcement of the "mustache" portion of the regulations. Doughty had grown a mustache prior to enrolling in school for the 1971–72 school year, but was told to shave it by Mr. Watts, the Principal of the school, shortly after the beginning of the school term. Doughty shaved his mustache at the time, but was again attempting to grow a mustache at the time of the hearing. There was no evidence to support a finding that his attempts at growing a mustache were disruptive or that the mustache posed a health or safety hazard.

The defendants attempted to justify the imposition of the regulations concerning hair primarily on the grounds that it was necessary to the educational process to maintain a certain degree of decorum in the classroom and that long hair somehow interfered with the achievement of that objective. Mr. Ford, the Superintendent of the school system, stated that the school did not want to put "robots" out into the world, but that a certain degree of conformity was necessary in order to develop "certain value systems".

The findings of fact by this Court at the conclusion of the hearing on the merits, with respect to the "hair" provisions, along with the findings set forth herein, make it quite clear that this Court has no alternative but to make its temporary injunction permanent and to declare that the "hair" portion of the regulation which provides:

"This means that their hair will be trimmed; it will not be down over the ears, in the eyes or down over the shirt collar. The face will be clean shaven—no mustaches, beards or sideburns below the ear lobes."

is invalid on its face and thus unenforceable.

The remaining portions of the dress code present legal issues that have caused this Court much difficulty. A statement of the facts surrounding those issues is necessary at this point.

Cynthia Mitchell, a twelve-year-old seventh grader at Perryville Junior High School, was, on three different occasions, advised that her wearing apparel was in violation of the dress code.

---

gans, pictures, or emblems, etc. will not be worn except school approved emblems."

The defendants were permitted to enforce the remaining provisions of the code.

On the first occasion, she was wearing a white blouse and white jeans with a zipper in the front. There was no complaint concerning the tightness of the jeans; however, she was advised that having a zipper in the front of the jeans was a violation of the code. She was told to pull out her shirttail to cover the zipper. Since the shirt that she was wearing was not "straight around the bottom", thus a violation of the code, it was necessary that she change into the top that she normally wore in gym class. On the second occasion, she was wearing jeans that had buttons in the front. Again, there was no contention that the jeans were too tight, but, again, she was required to pull her shirttail out so that the buttons would not be exposed. On the third occasion, she was wearing boy's jeans which had a zipper in the front. Again, she was required to pull out her shirttail. Miss Mitchell missed no class time as a result of the above incidents. There was no contention that her clothing was unclean or immodest and there was no evidence of any disruption caused by her clothing.

Charlene Wallace, a fourteen-year-old ninth grader, was advised that her clothing was in violation of the code on two occasions. On the first occasion, she was wearing a flowered "jump suit" and blouse made by her mother for the purpose of wearing them to school. She was advised that her apparel violated the dress code. Since she had no other clothing at the school, her father had to pick her up at the school and take her home. On the second occasion, she was wearing a "knicker suit". Again she was sent home.. Neither the "knicker suit" or "jump suit" was specifically covered by the code. There was no contention that they were unclean, immodest, or that they caused a disruption. In fact, the only explanation given by the defendants was that since they were not specifically permitted by the code or anticipated in drafting the code, they were excluded.

Melody Brown, a ninth grader, was advised on three occasions that her apparel violated the dress code. On the first occasion, she was wearing a "midi" dress that extended more than six inches below her knee. The dress was made by her mother to be worn to school. On the second occasion, she was wearing a "knicker suit", again made by her mother, and was required to spend the entire afternoon in the Principal's office. On the last occasion, she was wearing a "jump suit". She was not told why it was in violation of the code. Again, she was not permitted to return to class. There was no contention that the clothes were unclean, immodest or that they caused a disturbance.

Donna Van Dalsem, a sixteen-year-old eleventh grade student, was advised, on one occasion, that her dress was too short. The skirt was measured by the Principal's secretary and it was found to be seven or seven and one-half inches above the knee, thus a violation of the code. Miss Van Dalsem is five feet nine inches tall. There was no contention that the dress was immodest; however, it did violate the provisions of the code. There was no evidence that the dress had caused any disruption.

The last student to testify on this issue was Darralyn Doughty, a thirteen-year-old eighth grade student. On one occasion, she was advised that she could not wear pants with buttons in the front. There was no contention that her pants were too tight or that they were unclean or caused any disruption in the classroom.

There is no contention that the code was enforced selectively in such a way as to discriminate against any of the plaintiffs. From all that appears, it is being applied uniformly and "across the board". It is also undisputed that the plaintiffs knew of the provisions of the dress code. However, part of the code, as interpreted by the defendants, had the effect of prohibiting all types of clothing not specifically authorized even though the code listed only certain items as being prohibited. This ambiguity and subsequent interpretation caused much confusion and resulted in students

being sent home for wearing "knicker suits" and "jump suits" though they were not specifically prohibited by the code.

The primary witness for the defendants was Mr. J. L. Ford, the Superintendent of the school system. He testified that there was no dress code when he arrived at the school district in 1970. He stated that the primary reason for the dress code was to prohibit the wearing of certain apparel which tended to be revealing or seductive. He stated that the provisions with respect to the boys were drafted to prohibit the wearing of "bizarre" clothing which might be disruptive in the classroom. It was also his opinion that an attitude of "disrespect for oneself" would develop if the students were permitted to wear the clothes prohibited by the code. When asked by the attorney for the plaintiffs why the code was not drafted simply to prohibit clothing that was "suggestive, immodest or revealing", Mr. Ford replied that he thought that a detailed and specific code was better than a general code in that it gave the students and their parents specific guidelines to follow. The primary reason, however, was, in Mr. Ford's opinion, an attempt to assist the faculty and the administration in the enforcement of the code. He stated that it would be poor educational policy to place a member of the faculty or the administration in the position of having to suspend a student for wearing "revealing, immodest or suggestive" clothing. In an attempt to relieve the administration of the responsibility of having to make such judgments, it was, therefore, necessary to establish certain definite standards, even though they may be arbitrary. Stated another way, a definite policy was adopted so that the school administration would not have to deal with individual problems concerning

dress, thereby avoiding any embarrassment to individual students.

Having reviewed these basic facts, it is necessary to note the legal standards which must be applied.

The Eighth Circuit Court of Appeals' ruling in Bishop v. Colaw, 450 F.2d 1069 (8th Cir. 1971), was limited factually to a violation of a school's "hair" regulation. The Court believes, however, that the following standard, set forth by that court, is applicable to "dress" provisions as well:

> "We believe that, among those rights retained by the people under our constitutional form of government, is the freedom to govern one's personal appearance. As a freedom which ranks high on the spectrum of our societal values, it commands the protection of the Fourteenth Amendment Due Process Clause.

> \*  \*  \*  \*  \*  \*

> "Personal freedoms are not absolute; they must yield when they intrude upon the freedoms of others. Our task, therefore, is to weigh the competing interests asserted here. In doing so, we proceed from the premise that the school administration carries the burden of establishing the necessity of infringing upon Stephen's freedom in order to carry out the educational mission of the . . . School."

The same standard was applied by that court in Torvik (Uhlenhopp) v. Decorah Community Schools, 453 F.2d 779 (8th Cir. 1972), and by this Court in its "hair" decisions. See Parker v. Fry, 323 F.Supp. 728 (E.D.Ark.1971); Hogue v. Bauer, Civ. No. LR–71–C–228 (E.D.Ark., decided Dec. 30, 1971).[3]

It is, therefore, concluded that students have a constitutional right to govern their personal appearance, with respect to their clothing or apparel, sub-

---

3. This Court has previously questioned the wisdom of permitting unqualified and unconditioned access to the federal courts in the school-rule context as the best means of vindicating such constitutional rights. See Parker v. Fry, supra, first footnote. But no limitations or restrictions on such access have as yet been recognized. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963).

ject to the right of the school authorities to establish those regulations which are necessary in order to carry out the educational mission of the school.[4] As more comprehensively stated in Union Pacific Railway Co. v. Botsford, 141 U. S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891):

"No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law. As well said by Judge Cooley: 'The right to one's person may be said to be a right of complete immunity; to be let alone.'"

The analysis in Richards v. Thurston, 424 F.2d 1281, 1285–1286 (1st Cir. 1970), although dealing only with a "hair" regulation, is helpful here:

"Determining that a personal liberty is involved answers only the first of two questions. The second is whether there is an outweighing state interest justifying the intrusion. The answer to this question must take into account the nature of the liberty asserted, the context in which it is asserted, and the extent to which the intrusion is confined to the legitimate public interest to be served. For example, the right to appear au naturel at home is relinquished when one sets foot on a public sidewalk. Equally obvious, the very nature of public school education requires limitations on one's personal liberty in order for the learning process to proceed. Finally, a school rule which forbids skirts shorter than a certain length while on school grounds would require less justification than one requiring hair to be cut, which affects the student twenty-four hours a day, seven days a week, nine months a year. See West-

ley v. Rossi [D.C.], 305 F.Supp. [706], at 713–714.

"[7] Once the personal liberty is shown, the countervailing interest must either be self-evident, or be affirmatively shown. We see no inherent reason why decency, decorum, or good conduct requires a boy to wear his hair short. Certainly eccentric hair styling is no longer a reliable signal of perverse behavior. We do not believe that mere unattractiveness in the eyes of some parents, teachers, or students, short of uncleanliness, can justify the proscription. Nor, finally, does such compelled conformity to conventional standards of appearance seem a justifiable part of the educational process.

"In the absence of an inherent, self-evident justification on the face of the rule, we conclude that the burden was on the defendant. Since he offered no justification, the judgment of the district court must be affirmed."

Although there have been many, many court decisions in the "hair-regulation" area, there have been very few cases dealing directly with dress codes as such. As suggested in *Richards*, supra, there is a difference. One's hair is an integral part of his person. If his hair is required to be short on the school grounds during school hours, it will certainly be short during the remaining hours of the day while away from school. But if one is limited in his attire at school because of a dress code, he will not necessarily be so limited after school hours. The restriction upon one's freedom is not as great or obvious or dramatic, overall, as a result of dress regulations as it is as a result of hair regulations. Although this is simply a matter of degree, it makes clear, as stated in *Richards*, that, generally, "less justification" is needed to sustain dress

4. It is clear that carefully drawn dress regulations which have the effect of promoting legitimate objectives, such as safety, health, decency and, indeed, classroom decorum, are permissible. See Bannister

v. Paradis, 316 F.Supp. 185 (D.N.H. 1970). And not all hair regulations are, per se, invalid. See Corley v. Daunhauer, 312 F.Supp. 811 (E.D.Ark.1970).

regulations than is needed to sustain hair regulations. Yet in neither case may one's liberty be restricted by school regulations unless that restriction is necessary to effectuate the state's legitimate interest in carrying out its educational mission.

■ The dress code here is a combination of both permissive and exclusionary regulations which to some extent set forth arbitrary standards of dress. Indeed, a certain degree of arbitrariness may be tolerated in this area, "arbitrary" in the sense that specific objective standards may be imposed which, when applied in certain unusual and exceptional circumstances, may not be too reasonable or fair. Such standards are not uncommon in our society and their enforcement is upheld as a function of the police power of the states where, for instance, the health and safety of its population justifies the imposition of such standards.

■ The enforcement of dress codes presents a difficult problem for the schools. Ideally, the faculty and staff of our schools should have as their primary objective the education of our children and not the promulgation and enforcement of dress codes. If, however, school boards elect to have regulations concerning dress and those regulations have a valid relationship to the educational mission of the school, a certain degree of arbitrariness should be tolerated to permit the effective and speedy enforcement thereof. The overriding public interest in requiring the educators of our children to allocate their time primarily to the educational process supports the argument for permitting the adoption of easily enforceable and easily understood detailed standards as an alternative to broad general rules such as "all students shall wear clean, sanitary, safe and decent clothing", which should also be permitted. Whichever approach is taken, the resulting code provisions must meet the *Bishop* test.

Having set forth the above guidelines for determining the validity of school dress codes, it is necessary to evaluate each provision of this code in the light of those standards.

■ The first provision which pertains to girl students reads as follows:

"Dresses, skirts and blouses, dress slacks and blouses or pant suits may be worn. No divided skirts or dresses; no jeans or shorts may be worn. Blouses that are straight around the bottom may be worn outside the skirt or slacks."

This provision was modified at the beginning of the school year by adding the following directive:

"We will allow jeans that are made for girls to be worn providing: If the jeans open in front, a tunic or square-tailed blouse must be worn to conceal the opening. If the jeans open on the side, then an ordinary length blouse may be worn."

These regulations set forth general guidelines for dress, excluding specifically certain forms of dress and by inference all other forms of apparel. Their primary objective is to prohibit the wearing of immodest apparel. Even though the regulation is directed at a legitimate objective, it has the effect of excluding legitimate forms of dress, as shown by the evidence, such as the "knicker suits" and the "jump suits" displayed by the plaintiffs. The defendants failed to sustain the burden of proving that such a rigidly drawn, arbitrary, and, in part, overly broad regulation is necessary in order to carry out the educational mission of the school. It must therefore be held invalid.

■ The second provision of the dress code provides: "The length of the skirts or dresses will be no more than six (6) inches above or six (6) inches below the knee". As discussed earlier in this opinion, the standard of six inches above the knee is an arbitrary one; however, the Court finds that it has a valid relationship to the legitimate objective of prohibiting immodest clothing in the school and that that objective

is necessary in order to carry out the educational mission of the school.

Of all of the rules at issue here this one presents the most difficulties conceptually. Such difficulties are illustrated by the evidence.

Miss Van Dalsem is taller than most of the girl students. The Court finds that there was certainly nothing immodest in her dress even though it violated the six-inch rule. Her case emphasizes the arbitrariness of the rule. Indeed, its unfairness when applied in extreme cases such as to a seven-foot girl, on the one hand, and a five-foot girl, on the other, is obvious. While approving the rule, the Court suggests that defendants make appropriate exceptions when the application thereof ceases to effectuate the objectives or purposes of the rule.

█ With respect to the provision prohibiting skirts to be worn more than six inches *below* the knee, the defendants testified that the regulation was adopted because dresses extending below that point might pose a safety hazard to the students when they were getting on and off of the buses. On cross-examination, however, it was learned that the same restriction was not placed on coats of the same length. Even though there may be some relationship between this regulation and a legitimate objective, the Court finds that the primary reason for adopting this regulation was to prohibit the wearing of what the defendants termed "bizarre" or unusual clothing. In addition, the Court finds that the relationship between this regulation and the legitimate objective of safety is not sufficient to outweigh a student's right to govern her appearance. That portion of the dress code is, therefore, invalid and unenforceable.

█ The third provision of the dress code provides that: "Excessively tight skirts or pants will not be allowed". The Court finds that this provision has a valid relationship to the legitimate objective of prohibiting immodest or suggestive clothing and that it is

not too vague or indefinite in this school context. See Esteban v. Central Missouri State College, 290 F.Supp. 622, 630 (W.D.Mo.1968); 415 F.2d 1077, 1088, 1089 (8th Cir.).

The fourth and fifth provisions of the code provide that: "Girls are expected to be neatly dressed and well groomed at all times. Girls will not come to school with their hair in rollers." These provisions were not challenged by the plaintiffs.

█ The first provision concerning boys states that: "Boys may wear dress or sport pants, including jeans." This regulation can be distinguished from the first provision in the code regarding girl students in that, reasonably interpreted, no legitimate forms of dress may be excluded by this provision. The next provision provides that: "No frayed trousers or jeans will be allowed." The objective of this provision was to exclude clothing that might be disruptive. This is a legitimate objective. However, the Court finds that the defendants failed to sustain their burden of showing that frayed trousers or jeans are disruptive of the educational process. There is, therefore, no valid relationship between this regulation and the educational mission of the school. It must be held invalid and unenforceable. The next provision states: "Shirt tails, unless the tail is straight and hemmed, will be worn inside the pants." There was no evidence to support a finding that shirttails worn outside of the pants were a disruptive influence. The only legitimate objective tendered by the defendants was that the tapered shirttails posed a safety hazard in the "shop" classes. Safety is, indeed, a legitimate objective. However, the attainment of this objective does not require such an overly broad regulation.

█ "Socks are required at all times." The rule applies only to boys. This is an unnecessarily arbitrary and overly broad regulation, even though intended to attain the legitimate objective of maintaining cleanliness and hygiene.

Such health objectives can be attained by a less restrictive rule.

The next provision provides that: "Boys will be expected to be neat at all times." This provision was not challenged by the plaintiffs.

Then follows the "hair" regulation. As stated earlier in this opinion, that provision is invalid and unenforceable.

The provision providing that: "No tie-dyed clothing will be worn" is also invalid and unenforceable. The defendants failed to show any relationship between that regulation and any legitimate objective of the school. There was no evidence that such clothing would be or had been disruptive.

The last provision provides that: "Shirts or clothing having slogans, pictures, or emblems, etc. will not be worn except school approved emblems." It is clear that this provision is aimed at the legitimate objective of prohibiting obscene or profane slogans or emblems from being displayed. The regulation, however, goes much too far. It has the effect of excluding other legitimate forms of expression and speech and thus violates the students' First Amendment rights. It is therefore invalid. This is not to say that certain forms of speech cannot be regulated and prohibited by the schools. Certainly they can prohibit obscene speech or expression, since they are not constitutionally protected forms of speech. And other forms of speech or expression can be limited or prohibited in the classroom context if such speech substantially disrupts the educational mission of the school or substantially interferes with the rights of others.[5] It should be emphasized, however, that any such restriction must not exceed that which is absolutely necessary to carry out such legitimate objectives.

It should be added here that if the defendants elect to enforce the valid portions of this dress code and/or adopt and enforce new provisions, they must provide adequate procedural safeguards to the students prior to the imposition of any disciplinary measures. For a discussion of such safeguards, see: The Joint Statement on Rights and Freedoms of Students, AAUP Bulletin 258 (Summer 1968); A Judicial Document on Student Discipline, 45 F.R.D. 133 (1968); Esteban v. Central Missouri State College, 415 F.2d 1077 (8th Cir. 1969); Stewart v. Reng, 321 F. Supp. 618 (E.D.Ark.1971).

This Court has jurisdiction of the parties and the subject matter. See Bishop v. Colaw, supra; Torvik (Uhlenhopp) v. Decorah Community Schools, supra; Parker v. Fry, supra; Hogue v. Bauer, supra.

The rulings herein supersede all prior inconsistent orders.

It is so ordered.

---

5. Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).