Paul KRAMER, Plaintiff-Respondent and Cross-Appellant,

v.

Frank E. HORTON, Chancellor of the University of Wisconsin-Milwaukee, Robert W. Corrigan, Dean of the School of Fine Arts of the University of Wisconsin-Milwaukee, and Gerald T. McKenna, Chairman of the Department of Music of the University of Wisconsin-Milwaukee, Defendants-Appellants and Cross-Respondents.†

Court of Appeals

*No. 84–762. Submitted on briefs February 1, 1985.—
Decided May 6, 1985.*
(Also reported in 371 N.W.2d 801.)

† Petition to review granted.

178

For the defendants-appellants and cross-respondents the cause was submitted on the briefs of *Bronson C. La Follette,* attorney general, with *Leroy L. Dalton,* assistant attorney general, of counsel, of Madison.

For the plaintiff-respondent and cross-appellant the cause was submitted on the briefs of *Meissner, Tierney, Ehlinger & Whipp, S.C.,* with *Dennis L. Fisher* and *Susan J. Marguet* of counsel, of Milwaukee.

Before Wedemeyer, P.J., Moser and Sullivan, JJ.

WEDEMEYER, P.J. Frank Horton, chancellor of the University of Wisconsin-Milwaukee, Robert Corrigan, dean of the School of Fine Arts of the University of Wisconsin-Milwaukee, and Gerald McKenna, chairman of the Department of Music of the University of Wisconsin-Milwaukee, all in an official representative capacity (UWM), appeal from orders denying their motions for dismissal and for summary judgment. UWM also appeals from a judgment which ordered a "name-clearing" hearing for Paul Kramer, a tenured professor in the Department of Music, and awarded him $38,654.17 for attorney's fees, expenses, and disbursements, under 42 U.S.C. sec. 1988.

Kramer cross-appeals from the judgment, arguing that he possessed a property interest in his position as oboist in the Woodwind Arts Quintet, a University organization, and that he was entitled to a hearing before he could be removed from the quintet. He also argues that the trial court applied an improper standard in awarding attorney's fees.

We hold as follows: (1) Because the pleadings sufficiently alleged the existence of a constitutionally protected liberty interest and the necessary elements of a civil rights claim under 42 U.S.C. sec. 1983, we affirm the trial court's order denying the motion to dismiss. (2) Because there were material issues of fact as to whether Kramer suffered impairment of liberty and property interests and whether he received sufficient notice to satisfy due process, we affirm the trial court's order denying the motion for summary judgment. (3) Because the trial court's findings of fact are not clearly

erroneous and are sufficient to support its conclusion of law that Kramer's liberty interest was violated, we affirm the judgment awarding Kramer a "name-clearing" hearing. (4) In regard to the cross-appeal, because the trial court did not misuse its discretion in setting the amount of attorney's fees, we affirm the award. (5) Because the trial court failed to address the questions whether Kramer had a property interest in his position in the quintet and whether that interest was violated, we remand the case to the trial court for further proceedings to determine appropriate findings of fact and conclusions of law.

The following facts are undisputed: The University of Wisconsin-Milwaukee is an educational institution within the University of Wisconsin system, created and existing under art. X, sec. 6 of the Wisconsin Constitution and ch. 36, Stats., and as such is a branch of the State of Wisconsin. The university is organized into colleges, schools and departments, each with its own faculty. The School of Fine Arts is one of the schools of the university, and the Department of Music is a part of the School of Fine Arts. Paul Kramer is a tenured professor of music in the Department of Music.

Kramer graduated from the New England Conservatory of Music in 1964. He received a master's degree from Boston University in 1966. His area of concentration is applied music, performing as an oboist.

Kramer began his concert career in 1941, as a high school student, by substituting with the Cleveland Symphony Orchestra. From 1943 to 1945, he played with the United States Army Grand Forces Band. While attending college, he played as a substitute oboist with the Boston Symphony. From 1946 until 1966 he played with the same symphony and, at other times during the same period, with the Boston Pops and Esplanade Orchestras. He also performed with the American Ballet Theatre Orchestra, Leopold Stokowski's American Symphony

Orchestra, the Baltimore Symphony, and the Pittsburgh Symphony.

In early 1966, Kramer auditioned for a position at the university and, on July 5, 1966, he accepted an appointment offered by Dean A.A. Suppan as assistant professor of music. The appointment letter stated: "In addition to teaching general and applied music, your services to the university will include performing."

At the behest of Dean Suppan, Kramer helped to organize the Woodwind Arts Quintet and to recruit its members. All of the individuals who were recruited for this teaching-performing role were outstanding professional musicians. By October 12, 1970, the formation of an all-faculty woodwind quintet was complete. Commencing in 1971, the quintet members were given formal release time from their teaching responsibilities in order to rehearse and perform. From time to time members left the quintet for various reasons and were replaced. Kramer helped recruit the new members.

Kramer received tenure and became an associate professor in 1971. In 1975, he was promoted to the position of full professor in the music department. He was an artist of national repute and was characterized as the "anchorman" of the Woodwind Arts Quintet.

Full-time music department faculty members usually received nine-month appointments for the academic year. Separate appointments, full or part-time, were made for the summer session. Kramer was a member of the quintet both during the school year and during the summer sessions from 1971 until September, 1979.

It was the custom of the members of the quintet to evaluate one another's performance as circumstances required. Although quintet members criticized Kramer's performance on several occasions between November, 1977, and July, 1979, at no time prior to July, 1979, did any member of the quintet tell Kramer that his perform-

ance must improve or the other members would try to remove him.

On July 20, 1979, the other members of the quintet asked Kramer to attend a meeting to be held July 21. At that meeting, the other members asked him to resign. They proffered no written statement of the reasons for their action. Kramer refused their request.

Kramer protested his removal from the quintet to the chairman of the music department, Emanuel Rubin, and to the dean of the School of Fine Arts, Robert Corrigan, but to no avail. Rubin removed him from the quintet and gave him added teaching responsibilities instead.

Kramer wrote to the university's Faculty Executive Committee, also known as the University Committee, requesting that his removal from the quintet be reconsidered. On September 29, 1979, the University Committee replied that his request ought to be directed to the executive committee of the music department. On the same date, the chairman of the University Committee also wrote to the chairman of the music department suggesting the desirability of establishing written rules for the hiring and dismissal of any person from the Woodwind Arts Quintet.

Kramer commenced this lawsuit on September 4, 1979, the first day of the 1979–80 academic year.

Kramer appealed his dismissal to the excutive committee of the music department on September 7, 1979. On September 11, the executive committee met to consider what procedures were to be used to review Kramer's reassignment from the quintet to teaching. Certain procedural rules were adopted.

On September 18, 1979, the executive committee of the music department convened a special meeting to review the decision to reassign Kramer from the quintet to additional teaching. Kramer was given no written statement specifying the reasons for his reassignment prior to

or at this meeting. He was not allowed to call witnesses. Although his counsel was present, counsel was not permitted to introduce evidence or cross-examine the speakers.

On September 26, the executive committee issued a written report affirming that Dr. Rubin had acted within the jurisdiction of his office in reassigning Kramer to full-time teaching duties and stated that an adequate basis existed for the decision and that it was in the best interests of the department.

In March, 1980, Kramer appealed the executive committee's decision to the chancellor on both procedural and substantive grounds. The appeal was denied. Kramer has exhausted all available procedures for administrative review.

## MOTION TO DISMISS

*Sufficiency of Allegations*

UWM first argues that Kramer's amended complaint fails to state a claim on which relief can be granted because the "liberty interest" allegation is insufficient. On a motion to dismiss, only the allegations of the complaint are tested. Whether the facts pleaded can be proved or whether a defense may be pleaded and proved that may vitiate the complaint are questions not before the court. *Riedy v. Sperry*, 83 Wis. 2d 158, 165, 265 N.W.2d 475, 479 (1978). In a ruling on a motion to dismiss, the complaint should be liberally construed and is entitled to all reasonable inferences necessary to achieve substantial justice. It should not be dismissed unless it appears with certainty that the plaintiff is not entitled to relief under the facts alleged. *Id.* at 166, 265 N.W.2d at 479–80.

Under 42 U.S.C. sec. 1983, only two elements are required to state a claim: (1) the plaintiff must have been

deprived of a right secured by the constitution or laws of the United States; and (2) the actions of the defendant must have been taken under color of state law. *Id.* at 163, 265 N.W.2d at 478. Kramer's complaint alleges he was dismissed from his position as the oboist in the quintet as a result of the various meetings held by his superiors at the university and the other members of the quintet. Kramer further alleges that the dismissal substantially harmed his professional reputation and seriously jeopardized his career as a performer and educator. We conclude that Kramer has stated a claim under sec. 1983.

*Notice of Claim Statute*

UWM next argues that the complaint and amended complaint fail to state claims upon which relief can be granted because they do not allege compliance with sec. 895.45, Stats. (1977), the "notice of claim" statute.[1] This statute prohibits the commencement of an action against a state employee for any act committed by the employee in the course of his or her duties, unless a written notice of claim is first served on the attorney general within ninety days of the event causing the alleged damages.

---

[1] Section 895.45, Stats. (1977), was in effect when Kramer was removed from the quintet. It provided in part:

(1) No civil action or civil proceeding may be brought against any state officer, employe or agent for or on account of any act growing out of or committed in the course of the discharge of such officer's, employe's or agent's duties, unless within 90 days of the event causing the injury, damage or death giving rise to the civil action or civil proceeding, the claimant in the action or proceeding serves upon the attorney general written notice of a claim stating the time, date, location and the circumstances of the event giving rise to the claim for the injury, damage or death and the names of persons involved, including the name of the state officer, employe or agent involved.

Section 895.45 was renumbered as sec. 893.82 by sec. 30, ch. 323, Laws of 1979.

In *Perrote v. Percy,* 452 F. Supp. 604 (E.D. Wis. 1978), the federal district court examined the same defense to a sec. 1983 claim as UWM now raises. In resolving the issue in favor of the plaintiff, the court observed: "Acceptance of the defendants' position would unacceptably elevate subtleties of state procedural law above the avenue of relief created by Congress for the protection of federal constitutional rights from deprivations by persons acting with state authority." *Id.* at 605. *See also Doe v. Ellis,* 103 Wis. 2d 581, 587–88, 309 N.W.2d 375, 377 (Ct. App. 1981).

We find this reasoning most compelling. We hold that Kramer's failure to allege compliance with sec. 895.45, Stats. (1977), does not bar his claim for relief.

### Exhaustion of Administrative Remedies

UWM next contends that the complaint fails to state a claim on which relief can be granted because it shows that Kramer did not exhaust his administrative remedies before filing suit. The basis for this contention is that the complaint, on its face, demonstrates that Kramer had previously commenced administrative action at the time he filed these claims. UWM cites *Castelaz v. City of Milwaukee,* 94 Wis. 2d 513, 289 N.W.2d 259 (1980), for the proposition that when there is provided an adequate administrative remedy, including court review of the administrative decision, exhaustion of administrative remedies is required before a sec. 1983 claim may be filed. We disagree.

First, UWM's reliance on *Castelaz* is misplaced. In addressing the same issue which we are examining, the supreme court declared:

The doctrine of exhaustion is a discretionary rather than a constitutional rule in § 1983 cases. There has been no allegation in this case that the civil service procedures available . . . were inadequate. . . . We believe that the no-exhaustion rule as applied to § 1983 claims brought in

state courts is not to be "woodenly" applied. We therefore follow the decisions of a number of the federal circuit courts of appeal which have held that, depending on the case, exhaustion of state administrative remedies *may* be required. [Emphasis added, footnote omitted.]

*Id.* at 534–35, 289 N.W.2d at 269.

It is evident from this statement that exhaustion of administrative remedies is not mandatory. Here, in contrast to the situation in *Castelaz,* Kramer's claims are based on the alleged constitutional inadequacy of the administrative procedures available. The supreme court recognized in *Castelaz,* albeit impliedly, that in this type of case exhaustion was not required. *Id.* at 535, 289 N.W.2d at 269. *See also Barry v. Barchi,* 443 U.S. 55, 63 n. 10 (1979) ; *Gibson v. Berryhill,* 411 U.S. 564, 574–75 (1973).

We further note that in *Patsy v. Board of Regents,* 457 U.S. 496, 516 (1982), the Supreme Court, after a thorough examination of sec. 1983's legislative history, concluded that exhaustion of state administrative remedies ought not be required as a prerequisite to bringing an action in federal court pursuant to sec. 1983. The order denying UWM's motion to dismiss is affirmed.

## SUMMARY JUDGMENT

UWM contends that the trial court erred in denying its motion for summary judgment. The trial court denied the motion without explication. We hold that because UWM failed to establish that there were no factual issues and that it was entitled to judgment as a matter of law, denial of summary judgment was proper.

In reviewing a trial court's denial of a motion for summary judgment, we proceed in the same manner as the

trial court by applying the standards set forth in sec. 802.08(2), Stats. Summary judgment may be granted only when there appears on the record to be no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. *Wright v. Hasley,* 86 Wis. 2d 572, 579, 273 N.W.2d 319, 322–23 (1979).. A summary judgment should not be granted unless the moving party demonstrates a right to a judgment with such clarity as to leave no room for controversy. Doubts as to the existence of a genuine issue of material fact should be resolved against the party moving for summary judgment. When the material presented on the motion is subject to conflicting interpretations or reasonable people might differ as to its significance, summary judgment is improper. *Grams v. Boss,* 97 Wis. 2d 332, 338–39, 294 N.W.2d 473, 477 (1980).

UWM argues that the undisputed facts available to the court at the time the motion for summary judgment was considered established that there were no liberty or property interest violations and that if due process was required, it was granted. We shall examine each aspect of UWM's argument separately.

## Liberty Interest

In order to withstand the summary judgment motion, Kramer had to demonstrate a deprivation of his liberty interest cognizable under the due process clause. The Supreme Court in *Board of Regents v. Roth,* 408 U.S. 564, 573–74 (1972), set forth the governing principles for an examination of this sort:

The State, in declining to rehire the respondent, did not make any charge against him that might seriously damage his standing and associations in his community. . . . Had it done so, this would be a different case. For "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." In such a case, due process would accord an

opportunity to refute the charge before University officials.[12] . . .

Similarly, there is no suggestion that the State, in declining to re-employ the respondent, imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities . . . . Had it done so, this, again, would be a different case. For "[t]o be deprived not only of present government employment but of future opportunity for it certainly is no small injury . . . ." [Citations omitted.]

---

[12] The purpose of such notice and hearing is to provide the person an opportunity to clear his name. . . .

UWM contends that there was no factual issue relating to whether the action of its officials in removing Kramer from the quintet and reassigning him to other professorial duties damaged his professional reputation and employability as a performing musician. It argues, first, that Kramer submitted no evidence that UWM published Kramer's removal from the quintet. We disagree. As this and later sections of the opinion will demonstrate, it is clear that the many tongues of rumor ran rampant in the music community.

The dean of the fine arts department, Robert Corrigan, testified in his deposition that the music community is fairly close-knit and that rumors tend to spread rapidly within it. As early as the summer of 1977, he began to hear negative comments about Kramer's performing ability. In late 1977 or early 1978, the members of the quintet came to see him about the problem they were having with Kramer. Corrigan also remembered discussing the matter with Emanuel Rubin, the chairperson of the music department, because Rubin brought the matter to his attention.

In June, 1979, Corrigan again met with the members of the quintet, who reiterated their criticism of Kramer's performance and his ability to work in a chamber music setting. Corrigan discussed the problem with Rubin. He believed that the members of the quintet had also dis-

cussed the problem with Rubin. At that time, however, they had not proposed their resolution of the problem to Kramer. Corrigan knew that the members of the quintet had "identified" someone to replace Kramer.

Rubin testified in his deposition that he was aware during the summer of 1979 that the quintet was searching for a replacement oboist. This all occurred before Kramer was asked to accept reassignment. In late summer Rubin and Corrigan again discussed the entire matter before reassigning Kramer. A replacement oboist was hired in September for the 1979–80 academic year. We conclude that whether UWM officials directly participated or knowingly acquiesced in the dissemination of information relating to Kramer's reassignment and the reasons therefor, before Kramer himself was informed, required a determination of fact.

UWM next contends that the undisputed facts were insufficient to show that Kramer's professional reputation or future employability was damaged. In *Churchwell v. United States,* 545 F.2d 59 (8th Cir. 1976), a probationary registered nurse was not rehired because her conduct on the job and irregularities in inventorying drugs had not met required performance standards. The court affirmed a partial summary judgment for the plaintiff and ordered a pretermination hearing. It stated:

[E]very dismissal from state or government employment does not implicate an interest in liberty. . . . "[W]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." . . . [W]here the state "imposed . . . a stigma or other disability that foreclosed . . . freedom to take advantage of other employment opportunities" the safeguards of notice and hearing are required. [Citations omitted.]

*Id.* at 62.

We do not deem it unreasonable to conclude that a person's interest in other employment opportunities can be

impaired where his superiors participate in recruiting efforts to replace him without affording him an opportunity to rebut the allegation. The dissemination of charges might seriously impair Kramer's standing in the community of professional musicians and would be likely to interfere with his later efforts to obtain employment. *Cf. Casey v. Roudebush,* 395 F. Supp. 60, 63 (D. Md. 1975).

UWM may not have directly publicized what was generally supposed in the music community to be the reasons for Kramer's removal from the quintet. It did, however, damage Kramer by, in effect, giving currency to the rumors in the community that he lacked the necessary musical qualities to discharge his responsibility. This resulted from failing to provide him an opportunity to rebut what it should have known were the community-believed reasons for his removal. "A due process hearing . . . minimally provides the employee an opportunity to establish that, even if he is to be dismissed, his dismissal follows from legitimate reasons and not the stigmatic ones generally supposed." *An-Ti Chai v. Michigan Technological University,* 493 F. Supp. 1137, 1157 (W.D. Mich. 1980) (footnote omitted).

We hold that on the record before the trial court on the motion for summary judgment, there was a substantial question of material fact whether Kramer's professional reputation and employability had been damaged. Kramer has minimally demonstrated a deprivation of his liberty interest cognizable under the due process clause. The trial court properly denied summary judgment on this issue.

*Property Interest*

In response to Kramer's claim of a property interest impairment, UWM argues that the undisputed facts dem-

onstrate neither an express contract or an implied-in-fact contract recognizable under Wisconsin law. UWM argues that Kramer had no claim of entitlement to the position of oboist in the quintet and that therefore there could be no property interest violation. We are not convinced.

In *Perry v. Sindermann*, 408 U.S. 593, 601 (1972), the Supreme Court declared: "A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing." It further stated that the absence of an explicit contractual provision may not always foreclose the possibility that an employee has a property interest. *Id.* "[Property interests] are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Roth,* 408 U.S. at 577.

"[T]he law of contracts in most . . . jurisdictions long has employed a process by which agreements, though not formalized in writing, may be 'implied.'" *Perry,* 408 U.S. at 601–02 (citing 3 *Corbin on Contracts* secs. 561–572A (1960)). "The essence of an implied in fact contract is that it arises from an agreement circumstantially proved." *Theuerkauf v. Sutton,* 102 Wis. 2d 176, 184, 306 N.W.2d 651, 657 (1981).

" '[A]lthough the primary source of property rights is state law, the state may not magically declare an interest to be *"non* property" after the fact for Fourteenth Amendment purposes if, for example, a longstanding pattern of practice has established an individual's entitlement to a particular governmental benefit.' " *Winkler v. County of DeKalb,* 648 F.2d 411, 414 (5th Cir. 1981) (citation omitted) (emphasis in original).

The depositions reviewed by the trial court for the purposes of summary judgment show that Kramer intended, when he was hired, to continue performing as a professional oboist. Communications took place between himself and Dean Suppan relating to the formation of a faculty woodwind group and his role in helping to organize it. Although his contract did not specify how he was to "perform," all the professors he assisted in recruiting were given contracts expressly stating their dual role as teacher and member of the Woodwind Arts Quintet. As a tenured professor from 1971 to 1979, Kramer's dual role was essentially the same as that of the other members of the quintet. Given this evidence of a pattern of practice, we hold that the question of whether there existed mutual understandings or implied agreements, with their accompanying justifiable expectations equivalent to entitlement, is very much in dispute and presents a material issue of fact. Thus the trial court was correct in denying the summary judgment on this issue.

*Satisfactory Notice and Hearing for Due Process Purposes*

UWM next contends that even if Kramer ought not to have been removed from the quintet without due process, the notice and hearing he received afforded him all the process he was due. It argues that the decision to remove him was careful and deliberate. It further argues that he was fully apprised of the other quintet members' dissatisfaction with his performance at least as early as July 21, 1979.

It is undisputed that Kramer never received written specifications of why he was unacceptable to the other members of the quintet. Kramer stated in his deposition that he never received any statement of why he was asked to resign from the quintet. He stated that at one

time he specifically asked the other quintet members why, but got no answer. A factual dispute thus existed as to whether Kramer had notice of the reasons for his removal.

UWM argues that Kramer received whatever process was due him at the hearing held before the executive committee of the music department. On September 18, 1979, after Kramer's removal, the executive committee convened to consider his petition to review the removal. The committee expressed displeasure with the procedure that had been used, but nevertheless found no denial of Kramer's rights and chose not to reverse Rubin's action in removing and reassigning Kramer.

There is no question that Kramer never received a pretermination hearing relating to his removal and reassignment. Kramer claims he never was afforded an opportunity to address the merits of his removal and reassignment. All that he was allowed to address at the September 18, 1979 meeting was the fairness of the procedure employed. This does not rise to the level of "an opportunity to respond" to the charges against him, identified by the Supreme Court as one of "[t]he essential requirements of due process." *See Board of Education v. Loudermill,* 53 U.S.L.W. 4306, 4309 (U.S. Mar. 19, 1985), *aff'g* 721 F.2d 550 (6th Cir. 1983).

In summary, Kramer established that factual issues existed regarding whether UWM published any information about his removal from the quintet, whether Kramer's professional reputation and future employability were damaged, whether facts and circumstances existed which would have created a legitimate expectation of future employment, and what sort of notice Kramer received as to the reasons for his reassignment. Further, the hearing Kramer received did not meet minimum due process standards. The trial court did not err by denying UWM's motion for summary judgment.

## NAME-CLEARING HEARING

This case involves due process, not artistic proficiency or acceptance by one's peers. The trial court concluded that Kramer possessed "a liberty interest in not being forcibly removed from the Quintet under circumstances which severely impugn his professional reputation and employability in a similar position." To support this conclusion, it found that UWM's actions in removing Kramer diminished his reputation in the university music community and his employability as a performing chamber musician. UWM attacks the trial court's findings that Kramer's professional reputation and future employability were damaged.

We shall not reverse a finding made by the trial court unless it is clearly erroneous. *Noll v. Dimiceli's, Inc.*, 115 Wis. 2d 641, 643, 340 N.W.2d 575, 577 (Ct. App. 1983); sec. 805.17(2), Stats. The test is not whether the evidence in support of the trial court's finding constitutes the great weight and clear preponderance of the evidence, but whether the evidence in support of a contrary finding constitutes the great weight and clear preponderance of the evidence. The trial court is the ultimate arbiter of the credibility of the witnesses, and when more than one reasonable inference can be drawn from the credible evidence, this court must accept the inference drawn by the trier of fact. *Noll*, 115 Wis. 2d at 643–44, 340 N.W.2d at 577.

The trial court considered the testimony of ten witnesses. Five of the witnesses offered observations or opinions as to the effect that Kramer's removal from the quintet had on his reputation.

Kramer himself learned that after the dismissal, other people began to question his professional abilities and capacity. Monte Perkins, a longtime performing bassoonist and music teacher in the Milwaukee area, said that Kramer's dismissal was a topic of conversation in

the music community. He said Kramer's removal "probably" caused a diminution of his reputation with the community. "It cast question on his ability as a performer and teacher, . . . in that if someone in their profession is not performing well . . . then you have the question, whether they would have the ability to teach someone else to do it."

Glenn Bowen, a University of Wisconsin-Madison music professor and the clarinetist in the Wingra Woodwind Quintet, testified that the rumors attending Kramer's dismissal damaged Kramer's reputation as a professional chamber musician. Allen Sapp, a professor of composition at the University of Cincinnati's conservatory of music, who has a broad administrative background in university musical departments, opined that a summary dismissal from a performing group would impact immediately on a musician's employment desirability. Even Robert Goodberg, one of the members of the quintet who sought Kramer's removal, concurred that the action had a detrimental effect on Kramer's reputation.

This testimony provides ample support for the trial court's findings of fact. The findings are not clearly erroneous and we shall leave them undisturbed.

## PROPERTY INTEREST

Kramer contends on cross-appeal that he possessed a property interest in his position as oboist in the quintet. He argues that the relationship existing between himself and the university was the equivalent of dual capacity employment in which he held an expectancy. He argues that his removal from the quintet and reassignment to teaching was a *de facto* demotion without a showing of cause, for which he was entitled a due process hearing.

The trial court's decision did not address the question of whether Kramer possessed a property interest in the oboist position. This case was tried to the trial court.

The court had an opportunity to view the witnesses, assess their credibility, and determine the probative value of their testimony. A mere reading of a record can never place this court in the same advantageous position as the trial court. Because of the significance of this issue, we remand the case to the trial court for appropriate findings of fact and conclusions of law.[2]

## ATTORNEY'S FEES

Kramer's second issue on cross-appeal relates to the award of $37,015 for attorney's fees, pursuant to 42 U.S.C. sec. 1988. The trial court set hourly rates for Kramer's counsel at $40–$65. Kramer contends that the trial court erred in setting that rate by considering the fees paid to attorneys under S.C.R. 81.02(1), $50 per hour for court time and $35 per hour for office time, and the fees paid for legal work contracted by the state, $50 to $60 per hour. Kramer's counsel requested rates ranging from $85 per hour for the lead trial counsel, to $65 per hour for associate lawyers who assisted. The trial court stated that $40–$65 represented a "reasonable balance" between the compensation normally paid by private clients and the compensation paid by governmental bodies.

The determination of what is a reasonable fee under sec. 1988 is left to the discretion of the trial court. Absent a misuse of discretion, the trial court's award will not be reversed. *Thompson v. Village of Hales Corners*, 115 Wis. 2d 289, 305, 340 N.W.2d 704, 712 (1983). We will not find a misuse of discretion unless discretion was not exercised or there was no reasonable basis for the

[2] We call the trial court's attention to the recently decided case of *Board of Education v. Loudermill*, 53 U.S.L.W. 4306 (U.S. Mar. 19, 1985), *aff'g* 721 F.2d 550 (6th Cir. 1983), for possible assistance.

trial court's decision. *Wisconsin Public Service Corp. v. Krist,* 104 Wis. 2d 381, 395, 311 N.W.2d 624, 631 (1981).

Here the trial court had the opportunity to review the affidavits containing the time sheets submitted by Kramer's counsel and the response filed by UWM. It considered the alternative proposals and then, acting on this information and the quality of representation given Kramer, determined that the hourly rate of $40 to $65 represented a reasonable "balance" between the compensation normally paid to counsel privately and that paid by government bodies for similar services.

Although every case must be evaluated on its own facts and circumstances, and rates vary among lawyers and among communities and as between partners and associates and lead lawyers and assistants, we cannot say that the trial court's determination was so unreasonable as to constitute a misuse of discretion. We therefore affirm.

*By the Court.*—Judgment affirmed and cause remanded for proceedings consistent with this opinion.