Paul KRAMER, Plaintiff-Respondent and Cross-Appellant,

v.

Frank E. HORTON, Chancellor of the University of Wisconsin-Milwaukee, Robert W. Corrigan, Dean of the School of Fine Arts of the University of Wisconsin-Milwaukee, and Gerald T. McKenna, Chairman of the Department of Music of the University of Wisconsin-Milwaukee, Defendants-Appellants and Cross-Respondents-Petitioners.

Supreme Court

*No. 84–762. Argued February 10, 1986.—Decided March 13, 1986.*

(Also reported in 383 N.W.2d 54.)

405

For the petitioners the cause was argued by *LeRoy L. Dalton,* assistant attorney general, with whom on the briefs was *Bronson C. La Follette,* attorney general.

For the plaintiff-respondent and cross-appellant there was a brief by *Dennis L. Fisher, Susan J. Marguet* and *Meissner, Tierney, Ehlinger & Whipp, S.C.,* Milwaukee, and oral argument by *Mr. Fisher.*

Amicus curiae brief was filed by *Bruce Meredith,* staff counsel, and Wisconsin Education Association Council.

WILLIAM G. CALLOW, J. The defendants, Frank Horton, Chancellor of the University of Wisconsin-Milwaukee, Robert Corrigan, Dean of the School of Fine Arts of the University of Wisconsin-Milwaukee, and Gerald McKenna, Chairman of the Department of Music of the University of Wisconsin-

Milwaukee, all in an official representative capacity (University), seek review of a published decision of the court of appeals, *Kramer v. Horton,* 125 Wis. 2d 177, 371 N.W.2d 801 (Ct. App. 1985). The court of appeals affirmed a judgment of the circuit court for Milwaukee county, Judge Harold B. Jackson, Jr., in which the circuit court ordered a "name-clearing" hearing for the plaintiff, Paul Kramer, a tenured professor in the Department of Music, and awarded him $38,654.17 for attorney fees, expenses, and disbursements, under 42 U.S.C. sec. 1988 (1976). The parties raise numerous issues on appeal, but one issue is dispositive: whether Kramer should have exhausted his administrative remedies prior to instituting this suit. Because we conclude that he should have exhausted his administrative remedies before commencing this action, we reverse the decision of the court of appeals.

In 1965 Paul Kramer, an oboist who had spent several years as a concert musician with the Boston Symphony and other orchestras, contacted the Chairman of the Department of Music at the University of Wisconsin-Milwaukee (Department) about a possible opening on the faculty for an oboist. He auditioned in the spring of 1966. The Dean of the School of Fine Arts sent him a letter of appointment later that year. The letter stated: "In addition to teaching general and applied music, your services to the university will include performing." Apparently, the Dean and Kramer had discussed the possibility of forming a woodwind quintet, composed entirely of faculty members of the Department. When Kramer accepted the appointment, the Woodwind Arts Quintet did not exist.

With the Dean's support, Kramer helped organize the Woodwind Arts Quintet (Quintet) and actively par-

ticipated in recruiting members. The formation of the all-faculty Quintet was completed in October, 1970. Beginning in 1971, members of the Quintet received formal release time from a portion of their teaching responsibilities to allow them to rehearse and perform.

Kramer received tenure and became an associate professor in 1971. In 1975 he was promoted to the position of full professor in the Department. Kramer was a member of the Quintet from 1970 until 1979 when the Chairman of the Department reassigned him to full-time teaching responsibilities which denied him the opportunity to participate in the Quintet. Believing he was treated unfairly in being reassigned, Kramer commenced this lawsuit.

Although most of the events surrounding Kramer's reassignment took place in July and August of 1979, problems within the Quintet had emerged as early as November, 1977. At a rehearsal of the Quintet in November, 1977, members of the Quintet criticized Kramer's performance at a prior concert during which he played with a cracked reed in his oboe. They discussed with Kramer their concerns about performance problems, rehearsal problems, stage mannerisms, and reed problems. They informed Kramer that his performance in the group was "unacceptable" because his playing was not up to the level it should be.

On more than one occasion between November, 1977, and July, 1979, members of the Quintet again expressed criticism of Kramer and voiced their concerns to him. Because the other members of the Quintet did not perceive any improvement on Kramer's part during this period, they became increasingly dissatisfied. Finally, in the summer of 1979, they concluded that

they could not continue playing in the Quintet with Kramer.

The frustrations of the other members of the Quintet culminated in a confrontation with Kramer on July 21, 1979, when the Quintet held a meeting at which the other members of the Quintet asked Kramer to resign from his position in the Quintet. Once again the Quintet members expressed to Kramer the basis for their dissatisfaction, but they did not provide him with a written statement of reasons for his requested resignation. Kramer refused to resign.

Kramer raised objections to his proposed removal with the Chairman of the Department and with the Dean of the School of Fine Arts, but to no avail. The Chairman, who was aware of the discontent of the other members of the Quintet, explained to Kramer that he could not conceive of a meaningful way to force a chamber music group to play with a member in whom they had no confidence. Believing it would serve the best interests of the University and the Quintet, the Chairman reassigned Kramer's time from rehearsing to teaching.

After learning of his reassignment, Kramer filed a grievance petition with the University Committee, the faculty executive committee for the entire University. The University Committee responded on August 29, 1979, informing Kramer that the Executive Committee of the Department was the appropriate forum in which to seek initial review of his reassignment. On September 4, 1979, the first day of class in the 1979–80 school year, Kramer commenced this lawsuit.

Kramer appealed his reassignment to the Executive Committee of the Department on September 7, 1979. On September 18, 1979, the Executive Commit-

tee convened a special meeting at which it reviewed the decision to reassign Kramer from rehearsing to additional teaching. Kramer did not receive a written statement of the reasons for his reassignment either prior to or at this meeting. The Executive Committee, however, did give him an opportunity to present his side of the story. He also was allowed to have counsel present, although neither he nor his counsel was permitted to call witnesses, cross-examine speakers, or introduce evidence.

On September 26 the Executive Committee issued a written report in which it affirmed that the Chairman had acted within the jurisdiction of his office in reassigning Kramer to fulltime teaching duties. According to the report, the Executive Committee found adequate support for the decision and believed the decision served the best interests of the Department.

Kramer appealed to the Chancellor in March, 1980, challenging the Executive Committee's decision on both substantive and procedural grounds. In a letter dated October 29, 1980, the Chancellor denied Kramer's appeal. Kramer did not appeal the Chancellor's decision to the Board of Regents.

In his initial complaint, filed on September 4, 1979, Kramer claimed that the University had deprived him of his property right in the Quintet position in violation of the United States Constitution and the Wisconsin Constitution. Kramer filed an amended complaint on October 30, 1979, further alleging that the University deprived him of a property right and a liberty interest in violation of the fourteenth amendment to the Constitution. He asked for equitable relief under 42 U.S.C. sec. 1983 and for attorney fees under 42 U.S.C. sec. 1988. Finally, he asserted a second cause

410

of action alleging a violation of the Wisconsin Administrative Code, UWS sec. 6.01 (1975).

After denying the defendants' motions to dismiss and the defendants' motion for summary judgment, the circuit court held a trial in April, 1983. At trial several witnesses testified regarding damage to Kramer's reputation resulting from his removal from the Quintet. In October, 1983, the court decided that the University did not provide Kramer with due process because it did not give him an adequate hearing prior to or subsequent to his reassignment to fulltime teaching. Specifically, the court held that the University violated due process because it failed to provide Kramer with a written statement of the reasons for his reassignment and did not allow Kramer to call his own witnesses or cross-examine other witnesses.

The court entered judgment for Kramer in February, 1984, requiring that the University conduct a "name-clearing" hearing, pursuant to *Board of Regents v. Roth,* 408 U.S. 564 (1972), to rectify any harm to Kramer's liberty interest. Further, the court also entered judgment against the defendants in the amount of $38,654.47 to cover Kramer's costs, including reasonable attorney fees and reimbursement of expenses and disbursements.

The University appealed the circuit court's judgment; Kramer cross-appealed claiming the circuit court should have found a property interest in addition to a liberty interest.[1] The court of appeals issued its de-

---

[1] The circuit court did not address the question of the University's alleged violation of the Wisconsin Administrative Code, UWS sec. 6.01, and the issue was not raised on appeal.

cision in May, 1985, affirming the judgment of the circuit court.

Specifically, the court of appeals upheld the circuit court's denial of the defendants' two motions to dismiss. With regard to the defendants' assertion that Kramer failed to comply with the notice of claim statute, sec. 895.45, Stats. 1977, the court of appeals ruled that compliance is not required on a sec. 1983 action, citing *Perrote v. Percy,* 452 F. Supp. 604 (E.D. Wis. 1978). With regard to the defendants' assertion that Kramer failed to exhaust administrative remedies, the court similarly noted that exhaustion of administrative remedies is not mandatory in a sec. 1983 action, citing *Castelaz v. Milwaukee,* 94 Wis. 2d 513, 534–35, 289 N.W.2d 259 (1980).

On the due process question, the court of appeals affirmed the circuit court's ruling that the University deprived Kramer of a protected liberty interest without due process of law. The court of appeals also affirmed the circuit court's award of attorney fees. Finally, the court of appeals remanded the case and instructed the circuit court to determine whether Kramer had a property interest and, if so, whether the University deprived him of property without due process.

The defendants petitioned for review of the court of appeals' decision. In appealing to this court, the defendants again challenge both the lower courts' denials of their motion to dismiss and the courts' substantive decisions regarding due process. In an order issued on September 10, 1985, we granted review.

The defendants claim Kramer's complaint shows that the administrative action he commended in August, 1979, was still in progress when he filed suit on

September 4, 1979. Relying upon *Nodell Investment Corp. v. Glendale,* 78 Wis. 2d 416, 424, 254 N.W.2d 310 (1977), the defendants argue that, because Kramer failed to exhaust administrative remedies before filing suit, the courts erred in not dismissing his action. For further support, defendants cite *Castelaz v. Milwaukee, supra,* a case similar to the instant case, wherein the court stated that exhaustion of administrative remedies should be required whenever there exists an adequate administrative remedy.

Kramer initially argues that *Patsy v. Board of Regents,* 457 U.S. 496 (1982), controls this case. In *Patsy* the Supreme Court held that plaintiffs pursuing sec. 1983 claims in federal court need not exhaust administrative remedies. If we decline to apply the federal rule set forth in *Patsy* and decide to apply the general rule requiring exhaustion of administrative remedies, Kramer contends that three exceptions to the general rule apply to this case. He argues that the court should not require exhaustion of administrative remedies because (1) his challenge is primarily based on the inadequacy of the administrative remedy; (2) a substantial constitutional question is involved; and (3) recourse to the administrative agency is futile. *See Castelaz,* 94 Wis. 2d at 535; *Nodell Investment Corp.,* 78 Wis. 2d at 425 n. 12. In the alternative, Kramer contends that he exhausted all available administrative remedies.

In deciding whether to require exhaustion of administrative remedies in this case, the court of appeals, relying upon our statements in *Castelaz,* concluded that exhaustion is not mandatory in sec. 1983 cases. The court of appeals found that in *Castelaz* we implicitly recognized that courts should not require exhaustion in this type of case, wherein the plaintiff alleges that the

available administrative procedures are constitutionally inadequate. The court of appeals further buttressed its decision by noting that the Supreme Court in *Patsy* "concluded that exhaustion of state administrative remedies ought not to be required as a prerequisite to bringing an action in federal court pursuant to sec. 1983." *Kramer v. Horton,* 125 Wis. 2d at 187.

Applying a given rule of law to stipulated facts is a question of law. *First National Leasing Corp. v. Madison,* 81 Wis. 2d 205, 208, 260 N.W.2d 251 (1977). When reviewing a question of law, this court need not defer to the lower courts' reasoning. *Milwaukee Metropolitan Sewerage District v. DNR,* 126 Wis. 2d 63, 71, 375 N.W.2d 648 (1985).

While the court of appeals was correct in noting that exhaustion is not mandatory in sec. 1983 cases, our decision in *Castelaz* does not support the court of appeals' conclusion that a plaintiff can escape the exhaustion requirement merely by alleging that the available administrative remedies are constitutionally inadequate.

In *Nodell Investment Corp. v. Glendale, supra,* we stated the general rule that courts should deny judicial relief "until the parties have exhausted their administrative remedies; the parties must complete the administrative proceedings before they come to court." 78 Wis. 2d at 424. We noted that the exhaustion rule is premised on the assumption that an administrative remedy which will protect the party's claim of right is readily available to the party on his initiative. *Id.* We also acknowledged, however, that numerous exceptions to the rule of exhaustion come into play when the reasons supporting the exhaustion rule are not present. *Id.* at 425–26.

414

Because the plaintiff in *Castelaz v. Milwaukee* joined a sec. 1983 claim with state claims, *Castelaz* presented this court with an opportunity to discuss the exhaustion doctrine delineated in *Nodell Investment Corp.* in the context of sec. 1983 claims brought in state court. To assist our analysis we reviewed the Supreme Court decisions on exhaustion in sec. 1983 cases brought in federal court.

We found that in *Monroe v. Pape,* 365 U.S. 167 (1961), the Court applied a "no exhaustion" rule, allowing plaintiffs to pursue a sec. 1983 claim in federal court without requiring prior exhaustion of state judicial remedies. *Castelaz,* 94 Wis. 2d at 534. We noted that in subsequent decisions the Court appeared to expand the "no exhaustion" rule of *Monroe* to allow plaintiffs to pursue sec. 1983 claims in federal court without requiring prior exhaustion of either state judicial remedies or state administrative remedies. *Id.; see, e.g., Gibson v. Berryhill,* 411 U.S. 564 (1973); *Houghton v. Shafer,* 392 U.S. 639 (1968); *McNeese v. Board of Education,* 373 U.S. 668 (1963). Due to the inadequacy of the available state administrative remedies in these cases, however, exhaustion would not have been required even absent the federal "no exhaustion" rule. *Castelaz,* 94 Wis. 2d at 534–36. *See* Note, *Developments in the Law—Section 1983 and Federalism,* 90 Harv. L. Rev. 1133, 1274 (1977).

We concluded, therefore, that the Court had "expressly left open the question whether the no-exhaustion rule in [sec.] 1983 actions is 'invariably the case' when the administrative procedure is clear and adequate." *Castelaz,* 94 Wis. 2d at 536. Accordingly, we held that state courts may require exhaustion of admin-

istrative remedies in sec. 1983 cases in State court, essentially reaffirming our statement in *Nodell Investment Corp.* that courts should allow plaintiffs to pursue claims without requiring prior exhaustion of administrative remedies only when exceptions to the exhaustion doctrine are applicable. Because Castelaz failed to allege that the available procedures were inadequate or that the review board was biased, we held that he "was required to exhaust his administrative remedies prior to seeking relief in state courts under [sec.] 1983." *Id.* at 535–36.

Since our decision in *Castelaz,* the Supreme Court again has had the opportunity to discuss exhaustion of administrative remedies in the context of sec. 1983 actions in federal court. In *Patsy v. Board of Regents,* 457 U.S. 496 (1982), the Supreme Court, reversing a decision of the Fifth Circuit Court of Appeals in which the fifth circuit adopted a flexible exhaustion test, stated that it had on numerous occasions, beginning with *McNeese v. Board of Education,* 373 U.S. 668, 671–73 (1963), rejected the argument that federal courts should dismiss sec. 1983 actions when the plaintiff fails to exhaust state administrative remedies. 457 U.S. at 500. While the Court acknowledged that it could have based several of its decisions on traditional exceptions to the exhaustion doctrine, it reiterated "that exhaustion is not a prerequisite to an action under [sec.] 1983," and stated that it had "not deviated from that position in the 19 years since *McNeese.*" *Id.* at 500–01. The Court also based its holding on policy grounds and on its perception of the legislative history of sec. 1 of the Civil Rights Act of 1871, the precursor to sec. 1983, although the Court acknowledged that "the 1871 Congress was not presented with the question of exhaustion of administrative remedies." *Id.* at 507.

This case presents us with the opportunity to discuss the doctrine of exhaustion in the context of sec. 1983 claims for only the second time since our decision in *Terry v. Kolski,* 78 Wis. 2d 475, 254 N.W.2d 704 (1977), in which we opened the doors of state courts to sec. 1983 claimants by acknowledging that Wisconsin courts have concurrent jurisdiction with federal courts to hear claims brought under sec. 1983. As we explained above, in *Castelaz v. Milwaukee,* decided two years prior to *Patsy,* we held that a plaintiff bringing a sec. 1983 action in state court must exhaust his administrative remedies prior to commencing his sec. 1983 action. This case offers us an opportunity to reconsider *Castelaz* in light of the Supreme Court's ruling in *Patsy.* In deciding whether to continue to require plaintiffs to exhaust state administrative remedies prior to commencing a sec. 1983 claim in state court, however, we need not feel constrained by the Supreme Court's ruling in *Patsy* because *Patsy* concerned a sec. 1983 claim brought in federal court.

While the Constitution vests in Congress "the power to prescribe the basic procedural scheme under which claims may be heard in federal courts," *Patsy,* 457 U.S. at 501, it reserves to the state legislatures and state courts the power to prescribe the procedural scheme under which claims may be heard in state court. *See* U.S. const. amend. X. Considerations of comity and federalism dictate that a state court faced with a sec. 1983 claim must weigh different interests than a federal court when deciding whether to apply the exhaustion doctrine.

In a sense, our adherence to the exhaustion doctrine serves as a measure of our respect for the integrity of the procedural process which Wisconsin's administrative agencies afford to its citizens. With its progressive tradition, the Wisconsin legislature has afforded its citizens strong administrative protections throughout its history. This proud tradition undergirds our holding in *State ex rel. First National Bank v. M & I Peoples Bank*, 82 Wis. 2d 529, 544–45, 263 N.W.2d 196 (1978), in which we discussed *Nodell Investment Corp.* and stated "that parties must exhaust administrative remedies before seeking judicial review of allegedly unconstitutional administrative agency action if the action challenged can be remedied in the administrative agency."

Indeed, the doctrine of exhaustion of administrative remedies complements our progressive tradition. It provides state agencies with the opportunity to correct their own errors and prevents premature judicial incursions into agency activities. In addition, the doctrine of exhaustion promotes judicial efficiency. Conflicts often are resolved without resort to litigation. Further, if a case is not resolved in the agency, the process of agency review provides the court with a greater clarification of the issues and a more complete factual record.

Further, the doctrine of exhaustion is not inherently inconsistent with the purposes of sec. 1983. The exhaustion doctrine applies only when administrative remedies are adequate and readily available. *Nodell Investment Corp.*, 78 Wis. 2d at 424. If the administrative remedies are patently inadequate, or are adequate in theory but not in practice due to bias or delay, then the basis for applying the exhaustion doctrine does not exist,

and one of the exceptions should allow the plaintiff to escape from the clutches of bureaucratic tyranny. *Id.* at 425 n. 12.

Moreover, exhaustion does not foreclose access to the federal courts. Under *Patsy,* a sec. 1983 plaintiff can elect to pursue a claim in federal court without exhausting administrative remedies. In addition, a sec. 1983 plaintiff can pursue a claim in federal court even after exhausting state administrative remedies because res judicata and collateral estoppel do not attach to state administrative agency determinations. *See,* Comment, *Exhaustion of State Administrative Remedies in Section 1983 Cases,* 41 U. Chi. L. Rev. 537, 551 (1974).

■ Because we find a strong state interest in our continued adherence to the exhaustion doctrine and because we believe that requiring exhaustion of state administrative remedies is not inconsistent with the purposes of sec. 1983, we reaffirm our holding in *Castelaz.* When state administrative remedies are adequate and readily available, a plaintiff bringing a sec. 1983 claim in state court should exhaust his administrative remedies prior to commencing suit. Having concluded that state courts may require exhaustion of state administrative remedies as a prerequisite to sec. 1983 cases brought in state court, we must determine whether we should require exhaustion in this case.

As we noted in *Nodell Investment Corp.,* the exhaustion rule is premised on the notion that an adequate administrative remedy is readily available on the party's initiative. In arguing that the court should not require him to exhaust his remedies, Kramer claims that three exceptions apply to this case. First, Kramer asserts that he should not be required to exhaust

administrative remedies because his action essentially challenges the constitutionality of his available administrative remedies. Second, he argues that his action raises a substantial constitutional question. Third, he contends that pursuing the available administrative remedies would be futile.

In essence, Kramer's three claimed exceptions can be distilled into one argument. Kramer contends he should not be required to exhaust his administrative remedies because exhaustion would be futile due to alleged constitutional inadequacies in the available procedures. Believing that the University denied him due process in reassigning him, Kramer brought this action on the assumption that the available University review procedures were insufficient to remedy his alleged injuries.

As we noted in *State ex rel. First National Bank v. M & I Peoples Bank,* 82 Wis. 2d at 545, a party "must exhaust administrative remedies before seeking judicial review of allegedly unconstitutional administrative agency action if the action challenged can be remedied in the administrative agency." To escape the exhaustion requirement, therefore, Kramer basically must prove that the administrative body either cannot or will not afford him adequate relief. Absent evidence that the reviewing agency is inherently biased, or that the agency is unable or unwilling to hear the claim, or that the agency is delaying review unnecessarily, a plaintiff's naked assertion that available administrative remedies are inadequate is insufficient to negate the general rule requiring exhaustion of administrative remedies. *See Castelaz,* 94 Wis. 2d at 535.

When Kramer filed suit in this case, adequate administrative remedies were readily available to him. The Executive Committee had the power to review the circumstances surrounding the Chairman's decision to reassign Kramer, and the Chancellor had the authority to review the Executive Committee's decision. If the matter was not resolved at the institutional level, the Board of Regents had authority to review the Chancellor's decision. The University, therefore, afforded Kramer administrative procedures through which his alleged injury could be remedied.

Nonetheless, Kramer filed suit prior to exhausting these available administrative remedies. Further, when Kramer filed suit, he failed to prove that the available administrative remedies were inadequate. He offered no proof that the University was delaying review of the reassignment, was unable or unwilling to review the reassignment, or was biased in some way. We hold that none of the exceptions to the exhaustion doctrine are applicable to these facts. Kramer had an adequate administrative remedy readily available to him on his initiative. Before commencing this lawsuit, Kramer should have given the University an opportunity to correct the alleged injustices. Accordingly, we reverse the decision of the court of appeals and remand to the circuit court with instructions to dismiss.

*By the Court.*—The decision of the court of appeals is reversed.

Justice ABRAHAMSON, Shirley S. took no part.